IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
February 4, 2015 Session

**THE CHATTANOOGA-HAMILTON COUNTY HOSPITAL
AUTHORITY, D/B/A ERLANGER HEALTH SYSTEM
V.
UNITEDHEALTHCARE PLAN OF THE RIVER
VALLEY, INC., D/B/A AMERICHOICE**

**Appeal by Permission from the Court of Appeals, Middle Section
Chancery Court for Davidson County
No. 091253II     Carol L. McCoy, Chancellor**

_____

**No. M2013-00942-SC-R11-CV – Filed November 5, 2015**

_____

We granted permission to appeal to address whether exhaustion of administrative remedies is required in this lawsuit brought by a hospital against a TennCare managed care organization (MCO). The hospital alleged in its complaint that the MCO had not paid the hospital all of the monies due for emergency services provided to the MCO's TennCare enrollees. In its answer, the MCO asserted that it had paid the hospital in accordance with TennCare regulations; the MCO also filed a counterclaim regarding overpayments made pursuant to the TennCare regulations. The MCO filed a motion for partial summary judgment. It argued that the hospital's allegations implicitly challenged the applicability and/or validity of the TennCare regulations, so the Uniform Administrative Procedures Act (UAPA) required the hospital to exhaust its administrative remedies by bringing those issues to TennCare prior to filing suit. Absent exhaustion of administrative remedies, the MCO argued, the trial court was without subject matter jurisdiction to hear the case. The trial court agreed; it dismissed the hospital's lawsuit for lack of subject matter jurisdiction and dismissed the MCO's counterclaim as well. The Court of Appeals reversed; it concluded that the hospital's lawsuit was simply a dispute regarding the interpretation of statutes and regulations, over which the trial court had jurisdiction. The MCO appeals. Looking at the substance of the parties' dispute rather than simply the face of the hospital's complaint, we hold that the UAPA requires exhaustion of administrative remedies in this matter to the extent that resolution of the parties' claims would necessarily require the trial court to render a declaratory judgment concerning the validity or applicability of TennCare regulations. While the UAPA

1

prohibits the trial court from rendering such declaratory relief absent exhaustion of administrative remedies, it does not address claims for damages. In this case, both parties have asserted damage claims that hinge on the issues to be addressed in the administrative proceedings. Under these circumstances, we reverse the dismissal of the complaint and the counterclaim and remand the case to the trial court with directions to hold the parties' damage claims in abeyance pending resolution of administrative proceedings regarding the validity or applicability of the TennCare regulations at issue.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Reversed, Judgment of the Trial Court Affirmed in Part and Reversed in Part, and Case Remanded For Further Proceedings**

HOLLY KIRBY, J., delivered the opinion of the Court, in which SHARON G. LEE, C.J., and CORNELIA A. CLARK, GARY R. WADE, and JEFFREY S. BIVINS, JJ., joined.

J. Mark Tipps, John C. Hayworth, and Erin Palmer Polly, Nashville, Tennessee, for the appellant, UnitedHealthcare Plan of the River Valley, Inc., d/b/a AmeriChoice.

Herbert H. Slatery, III, Attorney General and Reporter; Andrée S. Blumenstein, Solicitor General; Linda A. Ross, Deputy Attorney General; Carolyn E. Reed, Assistant Attorney General; and Sue A. Sheldon, Senior Counsel, for the intervenor-appellant, Tennessee Attorney General.

Steven A. Riley and James N. Bowen, Nashville, Tennessee, for the appellee, The Chattanooga-Hamilton County Hospital Authority, d/b/a Erlanger Health System.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND
### Overview

Defendant/Appellant UnitedHealthcare Plan of the River Valley, Inc., d/b/a AmeriChoice ("AmeriChoice"), is a for-profit MCO in Tennessee's Medicaid system, TennCare. Plaintiff/Appellee The Chattanooga-Hamilton County Hospital Authority d/b/a Erlanger Health System ("Erlanger") is a not-for-profit tertiary care hospital based in Chattanooga, Tennessee. Through December 31, 2008, Erlanger and AmeriChoice had a contract for Erlanger to provide healthcare services to AmeriChoice enrollees, and AmeriChoice paid Erlanger for its services in accordance with the parties' contract. When the contract expired on January 1, 2009, Erlanger and AmeriChoice did not renew it.[1]

---

[1] The contract was renewed in a few respects, but none are relevant to the issues in this appeal.

Despite the failure to renew the parties' contract, Erlanger continued to provide emergency services to AmeriChoice enrollees. As addressed more fully below, Erlanger was required to provide such emergency services under the federal Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd (2011).

This appeal centers on a dispute between Erlanger and AmeriChoice over the rate AmeriChoice must pay Erlanger for the emergency services provided to AmeriChoice enrollees in the absence of a contract between the parties. A brief review of the TennCare system, the relevant statutes and regulations, and the nomenclature is helpful to an understanding of the issue on appeal.

## TennCare

TennCare is Tennessee's managed-care system for citizens eligible for Medicaid.[2] Under TennCare, the State of Tennessee enters into risk agreements with private MCOs. Under the risk agreements, the MCO arranges for the provision of healthcare services to eligible TennCare recipients who choose to enroll with that MCO ("enrollees").[3] The State, in turn, pays the MCO a monthly payment, known as a "capitation payment," for each enrollee. River Park Hosp. v. BlueCross BlueShield of Tenn., Inc., 173 S.W.3d 43, 48 (Tenn. Ct. App. 2002).

To facilitate the provision of healthcare services for its enrollees, each MCO develops a "network" of healthcare providers. The healthcare providers in the MCO's network are called "participating" providers, and the participating providers comprise the MCO's "provider network."[4] An MCO will generally aim to reduce costs by negotiating with the healthcare providers in its network to accept discounted rates for the services provided to the MCO's enrollees. Id. Healthcare providers that do not have a contract with an MCO but nevertheless provide services to the MCO's enrollees are referred to as

---

[2] Medicaid was established by the federal government in 1965 to provide health coverage for low-income individuals by using state and federal funds. River Park Hosp. v. BlueCross BlueShield of Tenn., Inc., 173 S.W.3d 43, 47 & n.2 (Tenn. Ct. App. 2002); State ex rel. Pope v. Xantus Healthplan of Tenn., Inc., No. M2000-00120-COA-R10-CV, 2000 WL 630858, at *1 (Tenn. Ct. App. May 17, 2000). Generally, the federal government sets certain standards for state Medicaid programs; if those standards are met, it provides partial funding for those programs. The states then supply the balance of the necessary funding and are responsible for delivery of covered services to eligible individuals. River Park Hosp., 173 S.W.3d at 47 n.2.

[3] Eligible TennCare recipients are free to enroll with the MCO of their choice.

[4] An MCO may charge its enrollees less for using "in-network" providers.

"non-participating" or "non-contract" providers. Overall, "[i]f the MCO pays less in provider fees than the total amount received in capitation payments, it earns a profit. If the amount spent on care exceeds the capitation payments, the MCO bears the loss." Id. Thus, under this system, the MCOs, and not the State, sustain "the financial risk involved in the administration of healthcare services to persons eligible for TennCare."[5] Id.

## EMTALA

In 1986, Congress enacted the federal Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd, as part of the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) (codified in various places in Title 42 of the United States Code). The purpose of EMTALA was to prohibit "patient dumping," that is, "the practice of a hospital that, despite its capability to provide needed medical care, either refuses to see or transfers a patient to another institution because of the patient's inability to pay." Baber v. Hosp. Corp. of Am., 977 F.2d 872, 873 n.1 (4th Cir. 1992); see also Beller v. Health and Hosp. Corp. of Marion Cnty., Ind., 703 F.3d 388, 390 (7th Cir. 2012). To this end, when a person without the ability to pay for medical services presents to a hospital's emergency room, EMTALA requires the hospital to first provide screening to ascertain whether the person has an "emergency medical condition."[6] If the hospital determines that the person has an emergency medical condition, the hospital must provide such treatment as is necessary to either stabilize the patient or transfer the patient to another facility. Beller, 703 F.3d at 390.

## DRA

Almost twenty years after it enacted EMTALA, the federal government enacted the Deficit Reduction Act of 2005 (DRA). The DRA included a provision entitled

---

[5] The purpose of implementing this type of system was to control spiraling healthcare costs while broadening the covered population. River Park Hosp., 173 S.W.3d at 48 n.3.

[6] EMTALA defines "emergency medical condition" as:

(A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in--

    (i) placing the health of the individual . . . in serious jeopardy,

    (ii) serious impairment to bodily functions, or

    (iii) serious dysfunction of any bodily organ or part . . . .

42 U.S.C. § 1395dd(e)(1)(A).

"Assuring coverage to emergency services." This provision addressed how non-contract providers of EMTALA-mandated emergency services are to be compensated for those services:

> Any provider of emergency services that does not have in effect a contract with a Medicaid managed care entity that establishes payment amounts for services furnished to a beneficiary enrolled in the entity's Medicaid managed care plan must accept as payment in full no more than the amounts (less any payments for indirect costs of medical education and direct costs of graduate medical education) that it could collect if the beneficiary received medical assistance under this subchapter other than through enrollment in such an entity. In a State where rates paid to hospitals under the State plan are negotiated by contract and not publicly released, the payment amount applicable under this subparagraph shall be *the average contract rate* that would apply under the State plan for general acute care hospitals or the average contract rate that would apply under such plan for tertiary hospitals.

42 U.S.C. § 1396u-2(b)(2)(D) (emphasis added). Thus, in Tennessee, where the "rates paid to hospitals under the State plan are negotiated by contract," the DRA provides that non-contract providers must accept "the average contract rate that would apply under the State plan" as the payment amount for EMTALA-mandated services.

Two years later, in response to this DRA provision, the Tennessee General Assembly enacted Tennessee Code Annotated section 71-5-108, entitled "State plan amendment; payment methodology." This statute provides:

> The TennCare bureau is directed to submit a state plan amendment to the centers for medicare and medicaid services that sets out a payment methodology for medicaid enrollees who are not also enrolled in medicare, consistent with provisions in § 6085 of the federal Deficit Reduction Act of 2005, regarding emergency services furnished by noncontract providers for managed care enrollees. The payment amount shall be *the average contract rate* that would apply under the state plan for general acute care hospitals. A tiered grouping of hospitals by size or services may be utilized to administer these payments. The payment methodology developed pursuant to this section shall be budget neutral for the state fiscal year 2007-2008 when compared to the actual experience for emergency services furnished by non-contract providers for medicaid managed care enrollees prior to January 1, 2007. It is the intent that this section only applies to the

emergency services furnished by non-contract providers for medicaid managed care enrollees.

Tenn. Code Ann. § 71-5-108 (2012) (emphasis added). In short, the statute directs TennCare to submit to the Centers for Medicare and Medicaid Services (CMS)[7] for approval an amendment to the State Medicaid plan that "sets out a payment methodology . . . consistent with [the DRA], regarding emergency services furnished by non-contract providers for managed care enrollees." Id. The statute provides, "The payment amount shall be the average contract rate that would apply under the state plan for general acute care hospitals." Id.

Pursuant to the directive in Section 71-5-108, TennCare submitted to CMS a State plan amendment regarding outpatient emergency services.[8] The amendment specified that the rate at which non-contract hospitals "shall be reimbursed" for providing outpatient emergency services to TennCare enrollees is "74% of the 2006 Medicare rates for those services." This State plan amendment was approved by CMS. Thereafter, effective May 11, 2009, TennCare promulgated a regulation to implement the State plan amendment:

1200-13-13-.08  PROVIDERS
(2) Non-Participating Providers.

. . . .

(b) Covered medically necessary outpatient emergency services, when provided to Medicaid managed care enrollees by non-contract hospitals in accordance with Section 1932(b)(2)(D) of the Social Security Act (42 U.S.C.A. § 1396u–2(b)(2)(D)), shall be reimbursed at seventy-four percent (74%) of the 2006 Medicare rates for these services. . . .

Tenn. Comp. R. & Regs. ch. 1200-13-13-.08(2)(b). This regulation is referred to as "the 74% Rule."

Subsequently, TennCare submitted to CMS a second State plan amendment, this one regarding inpatient hospital admissions required as a result of emergency outpatient

---

[7] CMS, previously known as the Health Care Financing Administration, is a federal agency within the Department of Health and Human Services that works in partnership with state governments to administer the Medicaid program and other programs.

[8] TennCare must submit amendments to the State Medicaid plan to CMS for approval. 42 C.F.R. §§ 430.10 to 430.25.

services.  This second amendment specified that the rate at which non-contract hospitals "shall be reimbursed" for such inpatient services for TennCare enrollees is "57% of the 2008 Medicare Diagnostic Related Groups (DRG) rates."  This State plan amendment was also approved by CMS.  Thereafter, effective March 17, 2010, TennCare promulgated a regulation to implement this second State plan amendment:

> Covered medically necessary inpatient hospital admissions required as the result of emergency outpatient services, when provided to Medicaid managed care enrollees by non-contract hospitals in accordance with Section 1932(b)(2)(B) of the Social Security Act (42 U.S.C.A. § 1396u–2(b)(2)(B)), *shall be reimbursed at 57 percent* of the 2008 Medicare Diagnostic Related Groups (DRG) rates (excluding Medical Education and Disproportionate Share components) determined in accordance with 42 CFR § 412 for those services. For DRG codes that are adopted after 2008, 57 percent of the rate from the year of adoption will apply. Such an inpatient stay will continue until no longer medically necessary or until the patient can be safely transported to a contract hospital or to another contract service, whichever comes first. . . .

Tenn. Comp. R. & Regs. ch. 1200-13-13-.08(2)(c) (emphasis added).  This regulation is referred to as "the 57% Rule."  Thus, both the 74% Rule and the 57% Rule pertain to compensation for non-contract providers who furnish EMTALA-mandated healthcare services to TennCare enrollees.

## Parties' Dispute

Meanwhile, in accordance with EMTALA, Erlanger continued to provide EMTALA-mandated services to AmeriChoice enrollees, even after the contract between Erlanger and AmeriChoice expired on December 31, 2008.  Erlanger provided to those enrollees both of the types of services addressed by the two State plan amendments---outpatient emergency services and inpatient services required as a result of the emergency outpatient services.  During the time in which Erlanger was a participating provider in the AmeriChoice provider network, the amount AmeriChoice paid to Erlanger for those services was the agreed amount set forth in the parties' contract.  For services Erlanger provided after the parties' contract expired, Erlanger billed AmeriChoice its standard charges for non-contract services.  AmeriChoice made some payments to Erlanger but refused to pay Erlanger's standard rates.  The resulting dispute set the stage for this lawsuit.

In June 2009, Erlanger filed a complaint against AmeriChoice in the Chancery Court for Davidson County.  In count 1, Erlanger sought a declaratory judgment that

Tennessee Code Annotated § 29-14-102 requires AmeriChoice to pay Erlanger (i) "at the rate equal to the prevailing average contract rate payable by TennCare MCOs" for EMTALA-mandated services and (ii) "at a reasonable rate of reimbursement for" services provided to patients after they are stabilized, which are not mandated by EMTALA. Erlanger's complaint also included a breach of contract claim (count 2) and an unjust enrichment claim (count 3), both seeking damages for the two categories of services described in count 1. Citing Tennessee Code Annotated section 71-5-108, Erlanger alleged that AmeriChoice was obligated to pay at least the "average contract rate" payable for EMTALA-mandated services. It also sought payment based on the reasonable value of non-emergency services provided after stabilization of emergency patients. Thus, in its complaint, Erlanger sought both declaratory relief and damages.

In August 2009, AmeriChoice filed its answer, claiming that it had paid Erlanger all that was due under applicable law. AmeriChoice asserted that TennCare regulations governed the rate at which it was required to reimburse Erlanger for EMTALA-mandated services and maintained that it had satisfied its obligations under the regulations.

AmeriChoice also asserted in its answer that, because Erlanger had relied on Section 71-5-108 instead of the relevant TennCare regulations regarding payments for EMTALA-mandated services, its complaint, in effect, challenged the applicability and/or validity of those TennCare regulations. AmeriChoice argued that Section 4-5-225(b) of the Uniform Administrative Procedures Act requires a complainant who seeks to challenge the validity or applicability of a statute or regulation to first petition the agency for a declaratory order. Tenn. Code Ann. § 4-5-225(b) (Supp. 2014).[9] Under this provision, AmeriChoice contended, Erlanger was required to seek a declaratory order from TennCare regarding the agency's interpretation of its regulations before filing a complaint in court against AmeriChoice regarding the parties' dispute.

In August 2012, the trial court granted AmeriChoice permission to file an amended answer and counterclaim. In its amended answer and counterclaim, AmeriChoice asserted that it had paid Erlanger for non-contract EMTALA-mandated services in a manner "at least consistent with, and in numerous times in excess of, the applicable rates required by law to be paid for the provision of the non-contract medical services at issue in this case." AmeriChoice estimated that it had overpaid Erlanger by about $6 million. In light of these overpayments, AmeriChoice asserted the defense of setoff and recoupment in its amended answer. In the counterclaim, it sought recovery of those alleged overpayments.

---

[9] That subsection of the UAPA provides: "A declaratory judgment shall not be rendered concerning the validity or applicability of a statute, rule or order unless the complainant has petitioned the agency for a declaratory order and the agency has refused to issue a declaratory order." Tenn. Code Ann. § 4-5-225(b).

8

## Motion for Partial Summary Judgment

Thereafter, AmeriChoice filed a motion for partial summary judgment seeking dismissal of Erlanger's complaint. AmeriChoice repeated its argument that Section 4-5-225(b) required Erlanger to first seek declaratory relief from the TennCare Bureau before pursuing relief in court, because the TennCare regulations set the rates at which AmeriChoice was required to reimburse Erlanger for the EMTALA-mandated services. Because Erlanger challenged the TennCare regulations applicable to the reimbursement rate for EMTALA-mandated services, AmeriChoice argued, the trial court lacked subject matter jurisdiction to adjudicate Erlanger's complaint. Thus, AmeriChoice maintained, it was entitled to summary judgment on those claims.

In response to the motion for partial summary judgment, Erlanger insisted that AmeriChoice was required to pay Erlanger the "average contract rate," as specified in the DRA. It argued that the only issue before the trial court was "the *factual question* of whether AmeriChoice has actually paid Erlanger at [the average contract] rate." (Emphasis in original). Erlanger acknowledged that TennCare enacted the 74% Rule and the 57% Rule to address the amounts owed to non-contract providers of emergency services. However, it "dispute[d] that the 74% and 57% Rules are consistent with the DRA." Erlanger added that, even if its argument could be considered a challenge to the TennCare Rules, the issue was properly before the trial court because "[c]ourts regularly decide the applicability of state rules and regulations to the actions of private parties . . . ."

The parties attempted to mediate their dispute, to no avail. They then filed joint stipulations regarding AmeriChoice's motion for partial summary judgment.

In September 2012, the trial court conducted a hearing on the motion for partial summary judgment. At the conclusion of the hearing, the trial court denied the motion but invited AmeriChoice to file a revised motion for partial summary judgment as to the applicable rates governing Erlanger's claims for reimbursement. Soon thereafter, AmeriChoice filed a new motion for partial summary judgment; this one asked the trial court for a holding that the 74% Rule and the 57% Rule established "the proper rate of reimbursement payable to [Erlanger]" for EMTALA-mandated services.

In response to this second motion for partial summary judgment, Erlanger argued that TennCare promulgated the 74% and 57% Rules to establish a "floor" for payments to non-contract providers of EMTALA-mandated services. In other words, the Rules set forth the method for calculating the *minimum* amount that an MCO had *to reimburse* a service provider; they do not set the *maximum* amount that a non-contract provider *must*

9

*accept* from the MCO. Erlanger claimed that AmeriChoice's interpretation, construing the Rules as determining the "ceiling" or maximum amount of payment, sidestepped the "carefully crafted language" in the Rules. AmeriChoice's interpretation, Erlanger maintained, "would result in a regulation that is contrary to the strictures of Federal and state law" and would require the trial court to find that the Rules are "in direct conflict with and preempted by the DRA, as well as in conflict with Tenn. Code Ann. § 71-5-108."

In November 2012, the trial court held a hearing on AmeriChoice's second motion for partial summary judgment. At the hearing, the trial judge orally ruled in favor of AmeriChoice. The trial court held: "[I]t would appear that the reimbursement rate is set at a 74 percent and 57 percent rule, and that the motion for partial summary judgment is well-taken."

Before the trial judge entered a written order, however, Erlanger filed a "Motion for Additional Argument" on Americhoice's motion for partial summary judgment, urging the trial judge to reconsider her stated position. Erlanger asserted that the 74% and 57% Rules "do not govern the rate that Erlanger must accept" for EMTALA-related services. The trial court's oral ruling, Erlanger argued, was contrary to the DRA and Section 71-5-108 and to the Tennessee and federal constitutions as well. Erlanger asserted: "[I]f the Court enters an order based on its announced view that the 74% and 57% Rules control Erlanger's right to reimbursement and the set rate that Erlanger must accept, its order would violate both the Tennessee and U.S. Constitutions."

At this point, Erlanger sent notice to Tennessee's Attorney General, pursuant to Tennessee Code Annotated section 29-14-107(b) and Rule 24.04 of the Tennessee Rules of Civil Procedure, that the constitutionality of the 74% and 57% Rules had been "drawn into question before the Chancery Court." The notice included a copy of Erlanger's "Motion for Additional Argument."

Upon receiving Erlanger's notice, the Attorney General gave notice of intervention for the purpose of addressing Erlanger's constitutional challenges to the Rules. Pursuant to the above-cited statute and rule, the Attorney General participated in the action. The Attorney General's position was aligned with that of AmeriChoice; the Attorney General argued that the "threshold obstacle to this Court rendering a judgment concerning the validity of [the 74% and 57% Rules]" was that "Erlanger has failed to raise its challenge by petitioning TennCare for a declaratory order concerning the validity of" those Rules.

## Trial Court Ruling

In December 2012, the trial court held a hearing at which it heard arguments from Erlanger, AmeriChoice, and the Attorney General. By the end of the hearing, the trial court was convinced that it was "without jurisdiction to grant the relief sought until and unless the affected person, in this case Erlanger, first seeks and has been refused a declaratory order from the agency whose rule is being challenged." Accordingly, the trial judge dismissed the entire action, even Erlanger's damage claims, "because [she could not] rule on Count II and Count III . . . until [she knew] what the State's position is and [what TennCare has] declared how the rule and the statute should be interpreted." The trial court held that AmeriChoice's counterclaim was "just like [Erlanger's] claim" in that it also required a ruling on Erlanger's assertion that the 74% and 57% Rules are either invalid or inapplicable. After hearing the trial court's ruling on Erlanger's petition, Americhoice agreed that the counterclaim must also be dismissed because it involved the same issues.

In January 2013, the trial court issued a written order holding that it was without subject matter jurisdiction to adjudicate Erlanger's claim for reimbursement for EMTALA-mandated services, based on Erlanger's failure to exhaust its administrative remedies under the UAPA. The written order also dismissed the counterclaim for the same reason. Both Erlanger's complaint and AmeriChoice's counterclaim were dismissed without prejudice, in order to permit the parties to refile them after Erlanger exhausted its administrative remedies with TennCare. The trial court did not dismiss Erlanger's claims relating to post-stabilization services not mandated under EMTALA.[10]

Erlanger sought permission for an interlocutory appeal of the trial court's January 2013 order. Both the trial court and the Court of Appeals granted permission for the interlocutory appeal.

## Court of Appeals Ruling

The intermediate appellate court reversed. Chattanooga-Hamilton Cnty. Hosp. Auth. v. UnitedHealthcare Plan of the River Valley, Inc., No. M2013-00942-COA-R9-CV, 2014 WL 2568456, at *11 (Tenn. Ct. App. June 6, 2014) ("Erlanger"). It found that Erlanger's claims involved merely a disagreement over the interpretation of the

---

[10] This appeal involves only Erlanger's claims for payments related to EMTALA-mandated services. It does not involve Erlanger's claim against AmeriChoice for payments related to post-stabilization (non-EMTALA) services.

regulations and held that Erlanger was not required to seek an administrative remedy prior to filing suit.  Id. at *11.

The appellate court observed that Erlanger's claims in this case are "strikingly similar" to the claims asserted by the plaintiff hospital in River Park Hospital, in which the plaintiff hospital claimed payment for EMTALA-mandated services in accordance with regulations in effect at that time.  Erlanger, 2014 WL 2568456, at *10 (citing River Park Hosp., 173 S.W.3d at 50).  The River Park Hospital Court, it noted, determined that the trial court had jurisdiction over the case and remanded for further proceedings.  In the instant case, the Court of Appeals saw "no difference in the types of issues and analytical approach in River Park Hospital and the case before us."  Id.  It held:  "[T]he dispute that is at the heart of this case is a difference over the interpretation of the relevant statutes and regulations.  Interpretation of the law is, in the first instance, the province of the courts."  Id.  The Court of Appeals also noted that this is a dispute between private parties and that a governmental entity is not involved.  It concluded, "Trial courts are often called upon to interpret statutes and regulations to resolve private parties' disputes, and this case is no different."  Id. at *11.

The Court of Appeals also said that any challenge to the constitutionality of the statutes and regulations would be a matter for the courts, not an administrative agency.  It recognized that no such constitutional challenge had been made in this case but nevertheless commented: "[E]ven if Erlanger were seeking to challenge the constitutionality of the regulations on payment for emergency services, which Erlanger denies, that issue is not appropriate for decision by an administrative agency and must be decided by a court."  Id. at *9 (relying on Colonial Pipeline Co. v. Morgan, 263 S.W.3d 827, 844 (Tenn. 2008)).

Thus, the Court of Appeals reversed the trial court's decision.  It held that the UAPA did not deprive the trial court of jurisdiction over Erlanger's complaint or AmeriChoice's counterclaim and remanded the case to the trial court for further proceedings.  Id. at *11.  We granted permission to appeal to address exhaustion of administrative remedies under the UAPA.

## ANALYSIS

The issue on appeal is whether the UAPA requires exhaustion of administrative remedies with TennCare before the parties' dispute may be resolved by the courts.  This is a question of law, which we review *de novo*, affording no deference to the decisions of the lower courts.  Word v. Metro Air Servs., Inc., 377 S.W.3d 671, 674 (Tenn. 2012).

On appeal, the parties take the same positions taken in the lower court proceedings. AmeriChoice and the Attorney General (collectively "Appellants") argue that the Court of Appeals erred and that the trial court's dismissal of Erlanger's complaint was correct. They contend that Erlanger's complaint, seeking additional payments from AmeriChoice, implicitly seeks a judicial declaration that the 74% and 57% Rules are either inapplicable or invalid. Those TennCare regulations, Appellants argue, set the rates at which non-contract providers "shall be reimbursed" for EMTALA-mandated services; they give no indication that the stated rates are intended to be a minimum or "floor," as argued by Erlanger. Thus, Erlanger's request for a ruling that it is entitled to "the average contract rate" under the DRA or Section 71-5-108 is in effect a request for a ruling that the TennCare Rules are invalid or inapplicable because they are inconsistent with the statutes. This triggers the UAPA's requirement of exhaustion of administrative remedies. The Appellants argue, "[T]o the extent Erlanger asserts that it is entitled to payment at rates different from those set forth in these governing TennCare regulations, its claims are subject to the UAPA" exhaustion requirement.

We look first at the doctrine of exhaustion of administrative remedies. "Courts traditionally . . . give great deference to an agency's interpretation of its own rules because the agency possesses special knowledge, expertise, and experience with regard to the subject matter of the rule." Pickard v. Tenn. Water Quality Control Bd., 424 S.W.3d 511, 522 (Tenn. 2013). For this reason, an agency's interpretation of its own rule has "controlling weight unless it is plainly erroneous or inconsistent with the regulation." Id. (quoting BellSouth Adver. & Publ'g Corp. v. Tenn. Regulatory Auth., 79 S.W.3d 506, 514 (Tenn. 2002)). This respect for the expertise and experience of administrative agencies gave rise to the common-law "exhaustion of administrative remedies" doctrine. See id. "The exhaustion doctrine has been recognized at common law as an exercise of judicial prudence." Colonial Pipeline, 263 S.W.3d at 838. The Court in Colonial Pipeline described the doctrine of exhaustion of administrative remedies:

> Justice Brandeis referred to it as "the long settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50-51, 58 S. Ct. 459, 82 L.Ed. 638 (1938). When a claim is first cognizable by an administrative agency, therefore, the courts will not interfere "until the administrative process has run its course." United States v. W. Pac. R.R. Co., 352 U.S. 59, 63, 77 S. Ct. 161, 1 L.Ed.2d 126 (1956).

Id. The administrative exhaustion doctrine protects and preserves administrative authority in several ways:

The exhaustion doctrine serves to prevent premature interference with agency processes, so that the agency may (1) function efficiently and have an opportunity to correct its own errors; (2) afford the parties and the courts the benefit of its experience and expertise without the threat of litigious interruption; and (3) compile a record which is adequate for judicial review.

Thomas v. State Bd. of Equalization, 940 S.W.2d 563, 566 (Tenn. 1997). It also allows the agency to engage in "specialized fact-finding, interpretation of disputed technical subject matter, and resolving disputes concerning the meaning of the agency's regulations." Colonial Pipeline, 263 S.W.3d at 839 (quoting West v. Bergland, 611 F.2d 710, 715 (8th Cir. 1979) (citations omitted)). "Requiring that administrative remedies be exhausted often leaves courts better equipped to resolve difficult legal issues by allowing an agency to perform functions within its special competence." Id. (citation and internal quotations omitted).

At common law, application of the exhaustion doctrine "is a matter of judicial discretion." Thomas, 940 S.W.2d at 566 n.5 (citing Reeves v. Olsen, 691 S.W.2d 527, 530 (Tenn. 1985)). Today, however, administrative remedies are addressed in statutes. Pickard, 424 S.W.3d at 523. "Generally, when a statute provides an administrative remedy, one must exhaust this administrative remedy, prior to seeking relief from the courts." Thomas, 940 S.W.2d at 566. However, "a statute does not require exhaustion when the language providing for an appeal to an administrative agency is worded permissively." Colonial Pipeline, 263 S.W.3d at 839 (citing Thomas, 940 S.W.2d at 566). Absent a statutory mandate, the decision on whether to dismiss a case for failure to exhaust administrative remedies is a matter of judicial discretion. Reeves, 691 S.W.2d at 530. In contrast, when exhaustion of administrative remedies is required by statute, the failure to do so will deprive the court of subject matter jurisdiction. Pickard, 424 S.W.3d at 523 (quoting Bailey v. Blount Cnty. Bd. of Educ., 303 S.W.3d 216, 236 (Tenn. 2010)); see also Colonial Pipeline, 263 S.W.3d at 842 (citing Watson v. Tenn. Dep't of Corr., 970 S.W.2d 494 (Tenn. Ct. App. 1998)).

Therefore, we must ascertain whether Erlanger was statutorily required to exhaust its administrative remedies before filing the instant action against AmeriChoice in the chancery court. To do this, we first look to the relevant provision of the UAPA:

(a) The legal validity or applicability of a statute, rule or order of an agency to specified circumstances may be determined in a suit for a declaratory judgment in the chancery court of Davidson County, unless otherwise specifically provided by statute, if the court finds that the statute, rule or order, or its threatened application, interferes with or impairs, or

threatens to interfere with or impair, the legal rights or privileges of the complainant. The agency shall be made a party to the suit.

(b) *A declaratory judgment shall not be rendered concerning the validity or applicability of a statute, rule or order unless the complainant has petitioned the agency for a declaratory order and the agency has refused to issue a declaratory order.*

(c) In passing on the legal validity of a rule or order, the court shall declare the rule or order invalid only if it finds that it violates constitutional provisions, exceeds the statutory authority of the agency, was adopted without compliance with the rulemaking procedures provided for in this chapter or otherwise violates state or federal law.

Tenn. Code Ann. § 4-5-225 (emphasis added).  In construing this statute, our goal is "to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope."  In re Kaliyah S., 455 S.W.3d 533, 552 (Tenn. 2015) (quoting Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995)).  "The text of the statute is of primary importance."  Mills v. Fulmarque, Inc., 360 S.W.3d 362, 368 (Tenn. 2012).  A statute should be read naturally and reasonably, with the presumption that the legislature says what it means and means what it says.  In re Kaliyah S., 455 S.W.3d at 552.

Section 4-5-225 first provides the manner in which an agency regulation can be challenged:  "The legal validity or applicability of a statute, rule or order of an agency to specified circumstances may be determined in a suit for a declaratory judgment in the chancery court of Davidson County."  Tenn. Code Ann. § 4-5-225(a).  The statute then prohibits a court from rendering a declaratory judgment "concerning the validity or applicability of a statute, rule or order unless the complainant has petitioned the agency for a declaratory order."  Id. § 4-5-225(b).  Thus, when a court is called upon to render a declaratory judgment "concerning the validity or applicability of" either a statute or regulation, it is without jurisdiction to do so unless the complainant has first exhausted its administrative remedies.  Subsection (b) of Section 4-5-225 is a clear proscription; it states that a court "shall not . . . render[]" a declaratory judgment before the administrative remedies have been exhausted.  Tenn. Code Ann. § 4-5-225(b); Colonial Pipeline, 263 S.W.3d at 842 ("In no uncertain terms, [Section 4-5-225] requires a prospective plaintiff to make a request for a declaratory order with an agency before bringing an action for a declaratory judgment in the Chancery Court.").  Consequently, if Erlanger's claims for relief necessarily require the trial court to render a declaratory judgment concerning the validity or applicability of the 74% or 57% Rules, then the trial

court was correct in holding that it was without jurisdiction to adjudicate Erlanger's claims absent exhaustion.

Erlanger insists that its lawsuit against AmeriChoice is not an action for declaratory judgment "concerning the validity or applicability" of the 74% or 57% Rules. Erlanger notes that its complaint did not include a challenge to the validity of either the statutes or the regulations and indeed did not even mention TennCare's 74% and 57% Rules.[11] Erlanger claimed in its complaint that it was entitled to the "average contract rate" for its services pursuant to the DRA and Section 71-5-108, and it sought an award of damages against AmeriChoice on that basis. In response to Erlanger's complaint, AmeriChoice argued that the Rules were partially applicable to Erlanger's claim for damages. It was only at this point that Erlanger challenged the regulations---*after* AmeriChoice cited the 74% and 57% Rules in its defense.

Even in its challenge to the Rules, Erlanger argues, it did not directly seek a declaratory judgment that the Rules are either invalid or inapplicable. Instead, Erlanger says, it disputes the *interpretation* of the Rules urged by Americhoice. Erlanger maintains that the Rules are not intended to set a "ceiling" or maximum amount that a non-contracting hospital must accept as payment for EMTALA-mandated services; rather, they are intended to set a "floor" or minimum amount. Erlanger's bases this argument on (1) the language of the statute, in that it does not say what Erlanger "must accept" in payment for EMTALA-mandated services; (2) the market-based nature of the TennCare system, in which rates are set by negotiation and agreement, not by the State; and (3) the "average contract rate" language of the DRA and Section 71-5-108.

Boiled down to its essence, Erlanger's contention is that it has not requested a "declaratory judgment . . . concerning the validity or applicability" of TennCare regulations because its complaint contains no reference to the 74% or 57% Rules. Thus, the premise of Erlanger's argument is that, in determining the applicability of the UAPA exhaustion requirement, the court is limited to looking at the face of the complaint. We disagree with this premise.[12]

---

[11] In fact, the 57% Rule, which went into effect in March 2010, could not have been mentioned in Erlanger's complaint, which was filed in June 2009.

[12] On March 28, 2013, after the trial court ruled that it lacked jurisdiction under the UAPA, Erlanger filed a "First Amended Complaint" that deleted count 1 of its original complaint in which Erlanger specifically requested a declaratory judgment on the measurement of damages. The amended complaint includes only claims for damages based on breach of implied contract and unjust enrichment. Like the original complaint, Erlanger's amended complaint does not mention the TennCare Rules and seeks payment based on the "average contract rate" under the statutes. The amended complaint's omission of the specific request for declaratory relief in count 1 does not affect our holding regarding

As noted above, the UAPA administrative exhaustion requirement is contained in the following language: "A declaratory judgment shall not be rendered concerning the validity or applicability of a statute, rule or order unless the complainant has petitioned the agency for a declaratory order." Tenn. Code Ann. § 4-5-225(b). This language does not limit the court to considering the face of the complaint. Rather, if the relief sought by a party would necessarily require the trial court to render a declaratory judgment "concerning the validity or applicability of a statute, rule or order," then the UAPA administrative exhaustion requirement is implicated.

To determine whether exhaustion of administrative remedies is required, the trial court must look to the substance of the parties' dispute. As previously noted by this Court, the trial court is not limited by a party's characterization of its own pleadings. Baptist Hosp. v. Tenn. Dep't of Health, 982 S.W.2d 339, 341 (Tenn. 1998).

This point is illustrated by the facts presented in Baptist Hospital. At the time the dispute in Baptist Hospital arose, Tennessee had a fee-for-service Medicaid system that predated the current managed-care TennCare system. The plaintiff hospitals in that case had provided services to Medicaid patients pursuant to provider agreements between the hospitals and the State of Tennessee. Id. at 339-40 & n.1. The hospitals filed a breach-of-contract complaint against the State in the Tennessee Claims Commission, asserting that the State had failed to pay the hospitals in accordance with the provider agreements. In response, the State argued that its payments were consistent with a new Medicaid regulation. Id. at 340.

The State filed a motion to dismiss, citing the UAPA exhaustion requirement. Id. It contended that, even though the hospitals' complaint sought relief for breach of contract, the hospitals were essentially challenging the validity of the Medicaid regulation on which the State relied in its defense. Under the UAPA, the State claimed, the hospitals were required to first file a claim with the Department of Health to allow the agency to address the validity of the new regulation. Because the hospitals had not done so, the State argued, the trial court did not have subject matter jurisdiction over the dispute. The Claims Commission denied the motion to dismiss, and an interlocutory appeal was granted. Id. The Court of Appeals reversed, holding that the trial court lacked subject matter jurisdiction, and the hospitals were granted permission to appeal. Id.

On appeal, the Baptist Hospital Court affirmed the decision of the Court of Appeals. It held that, although the hospitals characterized their lawsuit as a breach-of-

---

exhaustion of administrative remedies as to the validity or applicability of the TennCare Rules because we focus on the substance of the parties' dispute.

contract action, their claims were "premised on the contention that [the Medicaid regulation] is invalid." Id. at 341. Therefore, the Court held, "the hospitals' claim is properly classified as a challenge to the validity of [the Medicaid regulation]," not as a breach-of-contract action. Id. The Court stated unequivocally, "Claims challenging the validity of or applicability of a statute, rule, or order must be brought pursuant to the UAPA." Id. Because the hospitals had not exhausted their administrative remedies by first bringing the dispute to the pertinent agency, the Court in Baptist Hospital dismissed the complaint for lack of subject matter jurisdiction. Id.

In this case, as in Baptist Hospital, the determination regarding application of the UAPA is not limited to the face of Erlanger's complaint and is not governed by Erlanger's characterization of its own claims. It is made by considering the the substance of the parties' claims and defenses and the overall posture of the case. If resolution of the parties' dispute necessarily requires the trial court to render "a declaratory judgment concerning the validity or applicability of a statute, rule or order," then the trial court is without jurisdiction to adjudicate the claims until the administrative remedies have been exhausted.

The parties' dispute in this case is centered on the "validity or applicability" of the TennCare Rules. It is undisputed that AmeriChoice must pay Erlanger for the EMTALA-mandated services provided to AmeriChoice enrollees; the dispute concerns only the yardstick by which those payments are measured. AmeriChoice sought partial summary judgment on this very point, requesting that the trial court rule that the TennCare Rules governed this issue. After the trial court orally agreed with AmeriChoice on the application of the Rules, Erlanger filed its "Motion for Additional Argument," in which it claimed that application of the TennCare Rules in this manner "would be in violation of the statute and would be unconstitutional." Erlanger wisely recognized at this juncture that it was required to notify the Attorney General that the TennCare Rules were being "called into question" in the lawsuit. At the December 2012 hearing on the Motion for Additional Argument, Erlanger argued, "[T]he statute trumps the regulation[s]. The statute guarantees Erlanger the average contract rate." It insisted that, "unless 74[%] and 57[%] [Rules] are, in fact, the average contract rate, [TennCare has not] done what the statute directed [it] to do." Erlanger suggested to the trial court that, if AmeriChoice sought application of the TennCare Rules to the parties' dispute, AmeriChoice would first "need to go to TennCare . . . and see what the regulation means."

Thus, if the fact that the parties' dispute centered on the TennCare Rules was unclear when the complaint was filed, it became crystal clear once Erlanger filed its "Motion for Additional Argument." By contending that the TennCare Rules are not applicable to its claim for damages or in the alternative that they are invalid as

inconsistent with the statutes,[13] Erlanger in effect asked the trial court for a declaration "concerning the validity or applicability of" the TennCare Rules. Tenn. Code Ann. § 4-5-225(b). The term "declaratory" means "having the function of declaring, setting forth, or explaining." Bryan A. Garner, Garner's Dictionary of Legal Usage 252 (3rd ed. 2011). A judgment that grants no relief other than to set forth the parties' rights is a "declaratory" judgment. We decline Erlanger's invitation to look only at the face of its complaint and ignore the substance of the parties' dispute in determining whether the parties' arguments required the trial court to render declaratory relief to adjudicate its claims. See Baptist Hosp., 982 S.W.2d at 341 (noting that, although the hospitals characterized their lawsuit as a breach-of-contract action, the relief requested was necessarily "premised on the contention that [the Medicaid regulation] is invalid").

Erlanger contends that it is not required to exhaust administrative remedies because the UAPA applies only when a state agency is a party to the lawsuit. Erlanger does not point to any language in Section 4-5-225(b) to support this contention, but it relies instead on other cases in which a state agency is a party to the litigation. Erlanger describes the case at bar as one that "tests the limits of a Tennessee court's authority to abdicate judicial power to state administrative agencies in lawsuits between private parties." Here, Erlanger did not name TennCare as a defendant, and TennCare has never taken any action to enforce the disputed regulations against Erlanger, so Erlanger's lawsuit is between private parties only. The Court of Appeals agreed with Erlanger's position:

> Erlanger . . . has no complaint with the Bureau of TennCare and is not in an adversarial position with respect to any action the Bureau has taken against it or any other entity. Erlanger's complaint is with AmeriChoice, a private entity. The fact that regulations enacted by the Bureau of TennCare may come into play to resolve the parties' dispute does not transform Erlanger's complaint into a dispute with the Bureau of TennCare. Unlike Image Outdoor Advertising and the other cases upon which AmeriChoice relies, Erlanger is not complaining about an action a state agency took that had an adverse effect on Erlanger. Trial courts are often called upon to interpret statutes and regulations to resolve private parties' disputes, and this case is no different.

---

[13] Erlanger argues strenuously that it seeks only an "interpretation" of the TennCare Rules, contending that the Rules should be "interpreted" as establishing a "floor" for payments to non-contract hospitals for EMTALA-mandated services. This is another way of asking the Court to look only at a sliver of its argument rather than at its entirety. We decline to do so.

Erlanger, 2014 WL 2568456, at *11. Erlanger maintains that the Court of Appeals' holding was correct and that the trial court erred because this is simply a lawsuit between two private parties regarding the proper interpretation of TennCare statutes and regulations. It asserts, "No Tennessee court has ever held that the UAPA divests courts of original jurisdiction to decide disputes between private citizens over the interpretation or applicability of agency rules." Erlanger's argument goes further: "Divesting the courts of such jurisdiction in favor of administrative agencies violates the fundamental constitutional principle of separation of powers that 'it is the sole obligation of the judiciary to interpret the law . . . .'" (Quoting Richardson v. Tenn. Bd. of Dentistry, 913 S.W.2d 446, 453 (Tenn. 1995)). Erlanger insists that this case "is no different than other disputes that the courts of this State hear and properly decide every day." Therefore, Erlanger claims, the trial court had jurisdiction and erred in surrendering its jurisdiction to a state agency.

"[O]ne of the chief purposes of the [UAPA is] to provide a single method for obtaining judicial review of the decisions of state agencies." Pickard v. Tenn. Dep't of Env't and Conservation, No. M2011-01172-COA-R3-CV, 2012 WL 3329618, at *9 (quoting McEwen v. Tenn. Dep't of Safety, 173 S.W.3d 815, 820 (Tenn. Ct. App. 2005)); see Tenn. Code Ann. § 4-5-103(a) (stating that the UAPA must be construed as "remedial legislation designed to clarify and bring uniformity to the procedure of state administrative agencies and judicial review of their determination"). In many cases in which the applicability or validity of an agency regulation is being challenged, a state entity will be involved. See, e.g., Baptist Hosp., 982 S.W.2d at 341; Tolley v. Att'y Gen. of Tenn., 402 S.W.3d 232, 235 (Tenn. Ct. App. 2012) (citing Stewart v. Schofield, 368 S.W.3d 457, 464-65 (Tenn. 2012)); Hall v. McLesky, 83 S.W.3d 752, 756-57 (Tenn. Ct. App. 2002); Watson, 970 S.W.2d at 497. But it does not necessarily follow that a state entity will *always* be involved in a dispute over the application or validity of an administrative regulation.

Notably, our Court of Appeals has applied the UAPA exhaustion requirement in an action between private parties. In Image Outdoor Adver., Inc. v. CSX Transp., Inc., No. M2000-03207-COA-R3-CV, 2003 WL 21338700 (Tenn. Ct. App. June 10, 2003), a billboard company filed a declaratory judgment action against two private parties after the Tennessee Department of Transportation denied the billboard company's request for a billboard permit. The trial court dismissed the petition; it held, *inter alia*, that the petitioner billboard company was statutorily required to exhaust its administrative remedies before filing suit. Id. at *4. On appeal, the Court of Appeals noted that "[t]he UAPA sets out the statutory prerequisites for seeking review of an agency's actions through declaratory judgment proceedings." Id. (citing Davis v. Sundquist, 947 S.W.2d 155, 156 (Tenn. Ct. App. 1997)). It explained: "A declaratory judgment action is premature if the petitioner proceeds directly to judicial review without seeking an

20

administrative determination." Id. (citing Davis, 947 S.W.2d at 156; Hall, 83 S.W.3d at 757). The petitioner billboard company argued that its lawsuit was a dispute between private parties regarding "property interests." Id. at *5. The Court of Appeals found that, despite the characterization of the dispute by the petitioner billboard company, the trial court had correctly perceived that the petitioner's request for relief necessarily involved an allegation that the Department of Transportation had erroneously interpreted and applied the pertinent state statute. Id. at *6. The appellate court affirmed the trial court's dismissal of the complaint in part because the petitioner billboard company "failed to exhaust the administrative remedy statutorily required as a prerequisite to its declaratory judgment action. . . ."[14] Id. at *8. Thus, the appellate court applied the UAPA exhaustion requirement in a dispute in which no state agency was a party.

Indeed, the suit filed by Erlanger demonstrates how the validity and/or applicability of an agency regulation can become an issue in a suit between private parties, particularly when one party is subject to agency regulations. TennCare MCOs, such as AmeriChoice, are required to pay healthcare providers in a manner that comports with applicable TennCare rules, policies, and contract requirements. See Tenn. Comp. R. & Regs. ch. 1200-13-13-.06 (stating that MCOs "shall agree to comply with all applicable rules, policies, and contract requirements"). So, while MCOs are private parties, they function in partnership with TennCare.

Moreover, application of the UAPA administrative exhaustion requirement to disputes between private parties furthers the purpose of the statute by allowing the agency to engage in specialized fact-finding, interpret technical subject matter, and resolve disputes concerning the meaning of its own regulations. Colonial Pipeline, 263 S.W.3d at 839. It gives the parties and the courts the benefit of the agency's experience and expertise and helps ensure a record that is adequate for judicial review. See Thomas, 940 S.W.2d at 566. Therefore, we reject Erlanger's argument that the UAPA administrative exhaustion requirement applies only to cases in which a state agency is a party to the lawsuit.

Erlanger argues, and the Court of Appeals held, that this case is governed by the holding in River Park Hospital v. BlueCross BlueShield of Tennessee, Inc., 173 S.W.3d 43 (Tenn. Ct. App. 2002), in which the Court of Appeals adjudicated a dispute between private parties regarding a TennCare regulation. In River Park Hospital, the plaintiff was a non-contract hospital, not in the participating provider network of the defendant MCO. The hospital billed the MCO at its standard rate for the EMTALA-mandated services. Id.

---

[14] The Court of Appeals in Image Outdoor Advertising first commented that it did not need to address the exhaustion doctrine, but then went on to hold that the trial court's dismissal of the complaint was warranted in part by the petitioner's failure to exhaust administrative remedies. Image Outdoor Adver., 2003 WL 21338700, at *7, *8.

at 49-50.  The MCO refused to pay the standard rate; instead, it paid the non-contract hospital the same rate that it paid the MCO's in-network providers.  The MCO argued that its payments were in compliance with applicable TennCare regulations, the predecessors to the regulations at issue in this case.  Id. (citing then-applicable TennCare regulations, Tenn. Comp. R. & Regs. ch. 1200-13-12-.08(1) and (2)(a)).  The hospital filed suit; it sought a declaratory judgment that the MCO was required to compensate the hospital according to the hospital's reasonable, standard rates.  In its responsive pleading, the MCO sought a declaratory judgment that its method of paying non-contract providers the in-network rate was authorized by the applicable TennCare regulations.[15]  Id. at 50.

The parties in River Park Hospital agreed that the TennCare regulations at issue applied to their dispute.  They agreed that the regulations, by their plain language, at least set a "floor" for the amount the MCO was required to pay the non-contract hospital for services provided to the MCO's enrollees.  Id. at 55.  They disputed only the interpretation of the regulations; the MCO took the position that the regulations set the amount that must be accepted by the provider, while the non-contract hospital argued that they did not.  The appellate court construed the relevant regulation along with the related statutes and held that the regulation "was intended to prevent balance billing as against an enrollee and was not intended to allow MCOs to unilaterally set maximum reimbursement rates for out-of-network [non-contract] providers."  Id. at 56.

While River Park Hospital is factually similar to this case, the issue in this appeal was simply not presented in River Park Hospital.  In River Park Hospital, exhaustion of administrative remedies was not raised as an issue, so it was not discussed in the appellate court's decision.  Moreover, the parties in River Park Hospital agreed that the

---

[15]  The applicable regulations provided:

(1) In situations where a managed care organization authorizes a service rendered by a provider who is not under contract with the managed care organization, payment to the provider cannot be less than the amount that would have been paid to a provider under contract with the managed care organization for the same service. As a condition of payment, non-contract providers shall accept payment from managed care organizations as payment in full except for applicable deductibles, co-payments and special fees.

(2) Participation in the TennCare program will be limited to providers who:

(a) Accept, as payment in full, the amounts paid by the managed care organization, including enrollee cost-sharing, or the amounts paid in lieu of the managed care organization by a third party (Medicare, insurance, etc.) . . . .

Tenn. Comp. R. & Regs. ch. 1200-13-12-.08(1) and (2)(a) (2000).

TennCare regulations at issue were applicable and valid, so neither party sought a declaratory judgment concerning either the "validity or applicability of a statute, rule or order."[16] Tenn. Code Ann. § 4-5-225(b). Thus, the UAPA was not implicated in River Park Hospital. Therefore, while the factual similarities in River Park Hospital are interesting, the case is ultimately unhelpful in resolving the question of whether Erlanger was required to exhaust its administrative remedies before filing the instant lawsuit.

Erlanger makes an alternative argument about AmeriChoice's interpretation of the 74% and 57% Rules. Erlanger argues that AmeriChoice's construction of the Rules would "render them constitutionally suspect" because it would mean that TennCare enacted rules that are inconsistent with its legislative directive.

At this juncture, it is unnecessary for us to address this issue. We have held that Erlanger must first bring the parties' dispute to the TennCare Bureau, which may not adopt the construction of the 74% and 57% Rules advocated by AmeriChoice. Under these circumstances, it may never become necessary to rule on Erlanger's constitutional argument, so it is not ripe for our review. "Ripeness . . . requires a court to answer the question of 'whether the dispute has matured to the point that it warrants a judicial decision.'" West v. Schofield, --- S.W.3d ---, 2015 WL 4035399, at *6 (quoting B&B Enters. of Wilson Cnty., LLC v. City of Lebanon, 318 S.W.3d 839, 848 (Tenn. 2010)). "This Court will not pass on the constitutionality of a statute, or any part of one, unless it is absolutely necessary for the determination of the case and of the present rights of the parties to the litigation." State v. Crank, --- S.W.3d ----, 2015 WL 603158, at *10 (Tenn. Feb. 13, 2015) (quoting State v. Murray, 480 S.W.2d 355, 357 (Tenn. 1972)). Consequently, we decline to address this issue.[17]

Given the overall posture of this case and the substance of the dispute, we conclude that resolution of Erlanger's claims would necessarily require the trial court to render a declaratory judgment "concerning the validity or applicability of" the 74% and

---

[16] The regulations involved in River Park Hospital no longer exist; they predated the federal government's attempt to address this issue in the DRA and the State's attempt to comply with federal law in enacting Section 71-5-108. The regulations at issue in River Park Hospital are not similar to the current 74% and 57% Rules, which were implemented in response to the legislative directive to the TennCare Bureau to set out a methodology by which non-contract providers would be paid for EMTALA-mandated services.

[17] Erlanger makes the sweeping assertion that such a holding would "run afoul of the constitutional principle of separation of powers." Erlanger does not raise this as a separate issue, cites no authority to support its assertion, and acknowledges that "state agencies should have the right to complete their statutorily-required procedures *before* the courts intervene, and allowing them to do so does not violate the principle of separation of powers." (Emphasis in original) (citing Colonial Pipeline, 263 S.W.3d at 844; Richardson v. Tenn. Bd. of Dentistry, 913 S.W.2d 446, 455 (Tenn. 1995)). Under these circumstances, we decline to address this issue.

57% TennCare Rules.  Tenn. Code Ann. § 4-5-225(b).  The UAPA prohibits the trial court from doing so until the complainant has exhausted its administrative remedies. Accordingly, the UAPA exhaustion requirement applies to Erlanger's claims to the extent that adjudicating them required a declaratory judgment concerning the applicability or validity of the TennCare Rules at issue.

The UAPA does not prohibit the trial court from adjudicating a request for money damages; it only prohibits the trial court from rendering a declaratory judgment regarding the validity or applicability of agency regulations. However, in this case, a request for declaratory judgment regarding the applicability or validity of the TennCare regulations is implicit in Erlanger's claims for money damages.  Resolution of the administrative proceedings regarding the applicability or validity of the Rules serves as a roadblock to adjudication of the damage claims.  Under these circumstances, "we hesitate . . . to affirm the [trial court's] dismissal of the damage claim for fear of foreclosing [Erlanger's] opportunity to see such relief after completion of" the administrative proceedings.  Von Hoffburg v. Alexander, 615 F.2d 633, 641-42 (5th Cir. 1980); Barlow v. Marion Cnty. Hosp. Dist., 495 F. Supp. 682, 691 (M.D. Fla. 1980) (citing Von Hoffburg and surmising that "the fact that the complaint includes . . . remedies which the administrative agency cannot provide does not preclude application of the exhaustion requirement to the other claims"); see also Maryland Reclamation Assocs., Inc. v. Harford Cnty., 855 A.2d 351, 362-64 (Md. 2004) (discussing why a stay rather than a dismissal is appropriate in this situation, collecting cases); Town of Bolton v. Chevron Oil Co., 919 So. 2d 1101, 1111-12 (Miss. Ct. App. 2005) (relying on Von Hoffburg and holding that claims for money damages should have been stayed pending exhaustion of administrative remedies).  In the interest of judicial efficiency and to avoid the potential bar of a statute of limitations, we deem it prudent to reverse the trial court's dismissal of Erlanger's damage claims and instead remand those claims to be held in abeyance pending resolution of the TennCare administrative proceedings.

AmeriChoice also appeals in this case.  It contends that the trial court erred in dismissing its counterclaim along with Erlanger's complaint.  AmeriChoice argues that its counterclaim does not challenge the validity of the 74% and 54% Rules but instead *relies* on them to support its position that it overpaid Erlanger.  Consequently, with no trace of irony, AmeriChoice asserts that the UAPA exhaustion requirement is not implicated as to the counterclaim and that the trial court erred in dismissing it.

As noted by the trial court, AmeriChoice's counterclaim appears to present the other side of the same coin.  In response to the counterclaim, it appears likely that Erlanger will maintain that the Rules on which AmeriChoice relies are either inapplicable or invalid.  However, the record in this case does not show clearly the extent to which the

proceedings involving the counterclaim have progressed and whether Erlanger has in fact done so.

Regardless, from a practical standpoint, adjudication of AmeriChoice's counterclaim is checked by the same roadblock as Erlanger's complaint, namely, resolution of the dispute about the applicability or validity of the TennCare Rules. However, for the reasons outlined above, it is appropriate for the trial court to hold the counterclaim in abeyance rather than dismissing it. Therefore, we reverse the trial court's dismissal of Americhoice's counterclaim and remand to the trial court with directions to instead hold the counterclaim in abeyance pending resolution of the TennCare administrative proceedings.

## CONCLUSION

We hold that, looking at the substance of the parties' dispute, adjudication of Erlanger's complaint necessarily requires the trial court to render a declaratory judgment "concerning the validity and applicability of" the 74% and 57% TennCare Rules, and that such declaratory relief is prohibited by the UAPA absent exhaustion of Erlanger's administrative remedies with TennCare. For this reason, we affirm the trial court's holding that it was without jurisdiction to render a declaratory judgment regarding the validity or applicability of the Rules. However, we reverse the dismissal of Erlanger's complaint and AmeriChoice's counterclaim and remand with instructions for the trial court to hold the complaint and the counterclaim in abeyance pending resolution of the administrative proceedings.

The decision of the Court of Appeals is reversed, the decision of the trial court is affirmed in part and reversed in part as set forth above, and the cause is remanded to the trial court for further proceedings consistent with this opinion. Costs on appeal are to be taxed equally to Appellant UnitedHealthcare Plan of the River Valley, Inc., d/b/a AmeriChoice and to Appellee The Chattanooga-Hamilton County Hospital Authority d/b/a Erlanger Health System, for which execution may issue, if necessary.

_____
HOLLY KIRBY, JUSTICE