FILED
10/07/2021
Clerk of the
Appellate Courts

## IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### August 4, 2021 Session

## EMERGENCY MEDICAL CARE FACILITIES, P.C. v. DIVISION OF TENNCARE ET AL.

### Appeal from the Chancery Court for Davidson County
### No. 18-1017-II      Anne C. Martin, Chancellor

---

### No. M2020-01358-COA-R3-CV

---

This appeal involves a reimbursement limitation that TennCare imposed on "non-emergent" medical services provided by emergency department physicians. TennCare informed its managed care organizations of the reimbursement limitation via email without engaging in rule-making procedures outlined in the Uniform Administrative Procedures Act ("UAPA"). The trial court concluded the reimbursement limitation was a "rule" subject to the rule-making requirements of the UAPA and invalidated the reimbursement limitation. We hold that the reimbursement limitation falls within the internal management exception of the 2009 version of the UAPA and was therefore not subject to the UAPA's rule-making requirements. The ruling of the trial court is reversed.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and W. NEAL MCBRAYER, J., joined.

Herbert H. Slatery, III, Attorney General and Reporter, Andrée Blumstein, Solicitor General, Matthew Peter Dykstra, Assistant Attorney General, and Kyle C. Mallinak, Assistant Attorney General, for the appellants, Division of TennCare, Tennessee Department of Finance and Administration, Butch Eley, and Stephen Smith.

Gregory S. Reynolds and Keane Addison Barger, Nashville, Tennessee, for the appellee, Emergency Medical Care Facilities, P.C.

**OPINION**

OVERVIEW

This case requires us to determine whether a $50 reimbursement limitation ("$50 Cap") imposed by TennCare for "non-emergent" medical services provided by emergency department physicians is a "rule" under the Uniform Administrative Procedures Act ("UAPA"). Emergency Medical Care Facilities, P.C. ("EMCF") asserts TennCare improperly implemented this $50 Cap without first engaging in rule-making procedures. The trial court agreed with EMCF and held that (1) the $50 Cap is a rule as defined by the UAPA and (2) TennCare implemented the $50 Cap without complying with the UAPA rule-making provisions which renders it void and of no effect. TennCare appeals. A brief overview of the TennCare system, the contractual relationship between TennCare and EMCF, and TennCare's implementation of the $50 Cap is helpful to understanding the issues on appeal.

*TennCare*

Medicaid is a federal program created to meet the needs of millions of uninsured Americans who do not have resources to cover necessary healthcare services. *See State ex rel. Pope v. Xantus Healthplan of Tenn., Inc.*, No. M2000-00120-COA-R10-CV, 2000 WL 630858, at *1 (Tenn. Ct. App. May 17, 2000) (stating that the federal government established the Medicaid program in 1965 to provide health coverage to low-income Americans, through the use of state and federal funds); *see also* 42 U.S.C. §§ 1396–1396w-6. The Medicaid program is administered by the states. TennCare is Tennessee's managed care system for citizens eligible for Medicaid and is administered by the Tennessee Department of Finance and Administration. *See River Park Hosp., Inc. v. BlueCross BlueShield of Tenn., Inc.*, 173 S.W.3d 43, 47 & n.2 (Tenn. Ct. App. 2002) (providing an overview of TennCare's managed care Medicaid system). Through this managed care system, TennCare contracts with privately run intermediaries known as Managed Care Organizations ("MCOs") to develop a healthcare provider network for the provision of healthcare services to their respective TennCare members. Specifically, TennCare contracts with three private, for-profit MCOs: Volunteer State Health Plan, Inc. ("VSHP"); Amerigroup Tennessee, Inc. ("Amerigroup"); and UnitedHealthcare Plan of the River Valley, Inc. ("United"). When a healthcare provider enters into a provider agreement with an MCO, that provider is considered "in-network" for that MCO. Providers that have not entered into a provider agreement with an MCO are referred to as "out-of-network." Regardless of whether a healthcare provider contracts with an MCO, all healthcare providers who treat TennCare patients must sign a "Provider Payment and Participation Agreement" with TennCare.

*Emergency Medical Care Facilities, P.C.*

EMCF is a professional corporation located in Jackson, Tennessee that is comprised of physicians and other healthcare professionals providing services in Tennessee emergency departments. EMCF has contracted with VSHP since 2008 and is considered an "in-network" provider for that MCO's enrollees. EMCF is not contracted with Amerigroup, so it is an out-of-network provider with respect to Amerigroup's enrollees. As a condition of treating out-of-network TennCare members and receiving payment for those services, EMCF has executed a Provider Payment and Participation Agreement ("PPPA") directly with TennCare.

*The Genesis of the $50 Cap*

In early 2011, TennCare faced a significant budget reduction and was required to submit a budget to the governor that included spending reductions. To cover a portion of the budget shortfall, TennCare proposed a reduction in reimbursements to emergency-room physicians for non-emergent services provided in an emergency room. On March 14, 2011, the Governor submitted his proposed budget to the General Assembly, which included TennCare's proposed reduction for reimbursing emergency department physicians; however, the budget did not specify precisely how this reduction in reimbursement would be implemented.

On May 21, 2011,[1] the General Assembly passed the Fiscal Year 2011-2012 Appropriations Act (the "2011 Appropriations Act") implementing the State's 2011-2012 budget. The 2011 Appropriations Act included the following language regarding TennCare's ability to operate with the reduction in appropriations, stating in Section 12, Item 2:

> It is the intent of the General Assembly that the Commissioner of Finance and Administration shall have the authority to promulgate, as emergency rules pursuant to Tennessee Code Annotated, Section 4-5-209 those rules and regulations which concern the Medicaid/TennCare program, including Medicare Crossover payments, and which require promulgation in order for the state to fiscally function (i) within the appropriations provided for the Medicaid/TennCare program or (ii) within the availability of revenues received for the Medicaid/TennCare program.

In Section 48, Item 6, the 2011 Appropriations Act authorized the Commissioner of Finance and Administration to "reduce optional eligibility categories, mandate

---

[1] Governor Haslam approved the 2011 Appropriations Act on June 16, 2011.

- 3 -

standardized reimbursement levels, and/or reduce, or limit optional benefits in the TennCare Program as necessary to control program expenditures . . . ."

In April 2011, in anticipation of the 2011 Appropriations Act's passage, TennCare notified MCOs by "letter" sent via email of the following "programmatic changes":

This letter serves as official notice of programmatic changes to be made by the MCOs as a result of the proposed state fiscal year 2012 budget. As you are aware, all State Departments were required to submit proposed budgets that included spending reductions. . . . As a result, there are three categories of budget reduction items to be implemented by the MCOs: An 8.5% reimbursement reduction for some services/providers, changes to vaginal and cesarean deliveries reimbursement, and changes to reimbursement for non-emergency professional services in an ED. Below are the details:

. . .

- **Emergency Department Professional Fees** – Most of you have implemented a reimbursement policy for facilities whereby they are only paid an EMTALA screening fee for non-emergency ED visits. The budget directs MCOs to pay ED physicians their average reimbursement amount associated with CPT[2] 99281 for non-emergency visits.

*TennCare will promulgate emergency rules before July 1 requiring that these cuts be made thereby making it State law and regulation.* . . . We will be monitoring the progress of implementation to determine if policy changes are needed to implement this effectively and timely. . . .

(Emphasis added). On May 6, 2011, VSHP sent a letter to providers, including EMCF, giving notice of TennCare's proposed payment reductions. VSHP's letter mirrored TennCare's language regarding the reimbursement policy for emergency room physicians. The letter also stated, "TennCare will promulgate emergency rules before July 1 requiring that these cuts be made thereby making it State law and regulation."

---

[2] Current Procedural Terminology ("CPT®") "refers to a set of medical codes used by [healthcare providers] to describe the procedures and services they perform. Specifically, CPT® codes are used to report procedures and services to federal and private payers for reimbursement of rendered healthcare." AM. ACAD. OF PROF'L CODERS, *What is CPT®?*, https://www.aapc.com/resources/medical-coding/cpt.aspx (last visited Sept. 17, 2021). CPT codes reflect the complexity of treatment provided—the CPT 99281 code is "straightforward medical decision making." Letter from Timothy M. Westmoreland, Director of Medicaid at the Department of Health and Human Services, to State Medicaid Directors, "SMD Letter – Managed Care Provisions Regarding Coding of Emergency Services by MCOs" (April 18, 2000).

On May 25, 2011, the Assistant Director of TennCare Managed Care Operations sent an email to MCOs setting out the $50 Cap stating, in pertinent part:

Below are the final decisions regarding the reductions addressed in the 2012 Budget that will affect your organization. The following reductions will be effective July 1, 2011:

. . .

- **Emergency Department Professional Fees** – For non-emergent ED visits, professional claims that would otherwise have been reimbursed at rates higher than $50 will be paid at a rate of $50.

   o Each MCO must provide ED providers with the MCOs policy describing your process for determining Emergent vs. Non-Emergent claims. In addition to your MCOs process for a provider to appeal claims reimbursement, the policy must offer a front end process whereby the provider may submit documentation for review upon consideration of an initial claim.

Unlike the April 2011 communication from TennCare, this May 25, 2011 email did not reference "emergency rules" and it did not reference CPT codes. The next day, on May 26, 2011, a second email was sent to the MCOs offering "one clarification" on the Emergency Department Professional Fees section, stating: "Reimbursement for professional claims for non-emergency ED visits will be capped at $50. If the contracted rate is lower than $50 for the service billed, the MCO is to pay the contracted rate." Again, rule-making was not mentioned.

The $50 Cap became effective on July 1, 2011. TennCare did not go through the UAPA rule-making process to implement this change in reimbursement; rather, TennCare notified the MCOs of the $50 Cap and implemented the cap via email.

PROCEDURAL HISTORY

EMCF filed a petition in the Chancery Court of Davidson County on September 20, 2018, seeking a declaratory judgment under the UAPA that the $50 Cap is void and of no effect because it was a rule implemented without following the UAPA's rule-making procedures. EMCF also alleged that the $50 Cap violates federal and state law because it violates the prudent layperson standard for determining whether a patient's condition was an emergency medical condition. [3]

---

[3] Although not at issue in this appeal, the "prudent layperson standard" derives from 42 U.S.C. § 1396u-2(b)(2)(C) which states, in part:

- 5 -

After the parties engaged in extensive discovery, EMCF filed a motion for summary judgment arguing that the $50 Cap met the definition of a "rule" as a "matter of law" and there was nothing to exempt TennCare from rule-making requirements. TennCare filed a cross-motion for summary judgment arguing that the $50 Cap was not a rule and, if it was a rule, Tenn. Code Ann. § 71-5-102(d) exempted TennCare from following the UAPA's rule-making procedures in this case because the cap was a cost-cutting measure. The chancery court issued a thoughtful, eighteen page opinion and granted summary judgment on the UAPA issues determining that the $50 Cap was a "rule" because (1) it "is a statement by TennCare of general applicability, not only because it applies to all MCOs, but also that it potentially affects all providers;" (2) it "implements the 2011 Appropriations Act, as enacted by the General Assembly;" and (3) it "does not regard only the internal management of state government, but rather does affect private rights, privileges, and procedures available to the public." The court further held that Tenn. Code Ann. § 71-5-102(d) did not exempt TennCare from rule-making procedures. The trial court did not reach EMCF's argument that the $50 Cap violated state and federal law by circumventing the prudent layperson standard, stating, "EMCF has the option to continue litigating" those issues. The trial court issued a final judgment pursuant to Tenn. R. Civ. P. 54.02(1) with respect to its UAPA decision. TennCare appeals.

STANDARD OF REVIEW

This appeal arises from the grant of summary judgment by the trial court. We review a trial court's summary judgment determination de novo, with no presumption of correctness. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015). This means that "we make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Id.* We "must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor." *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002); *see also Acute Care Holdings, LLC v. Houston Cnty.*, No. M2018-01534-COA-R3-CV, 2019 WL 2337434, at *4 (Tenn. Ct. App. June 3, 2019).

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

---

[T]he term "emergency medical condition" means a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that a *prudent layperson*, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in--
    (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,
    (ii) serious impairment to bodily functions, or
    (iii) serious dysfunction of any bodily organ or part.

is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." TENN. R. CIV. P. 56.04. When a party moves for summary judgment but does not have the burden of proof at trial, the moving party must either submit evidence "affirmatively negating an essential element of the nonmoving party's claim" or "demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense." *Rye*, 477 S.W.3d at 264. Once the moving party has satisfied this requirement, the nonmoving party "'may not rest upon the mere allegations or denials of [its] pleading.'" *Id.* at 265 (quoting TENN. R. CIV. P. 56.06). Rather, the nonmoving party must respond and produce affidavits, depositions, responses to interrogatories, or other discovery materials that "set forth specific facts showing that there is a genuine issue for trial." TENN. R. CIV. P. 56.06; *see also Rye*, 477 S.W.3d at 265. If the nonmoving party fails to respond in this way, "summary judgment, if appropriate, shall be entered against the [nonmoving] party." TENN. R. CIV. P. 56.06. If the moving party fails to show he or she is entitled to summary judgment, however, "'the non-movant's burden to produce either supporting affidavits or discovery materials is not triggered and the motion for summary judgment fails.'" *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 83 (Tenn. 2008) (quoting *McCarley v. W. Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998)). A disputed fact is material if it is determinative of the claim or defense at issue in the motion. *Id.* at 84 (citing *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993)).

Our review of the construction and application of statutes is de novo, affording no deference or presumption of correctness to the decision of the lower court. *Heirs of Ellis v. Estate of Ellis*, 71 S.W.3d 705, 710 (Tenn. 2002).

ANALYSIS

The UAPA applies in this case because TennCare falls under its definition of "agency." Tenn. Code Ann. § 4-5-102(2) ("'Agency' means each state board, commission, committee, department, officer, or any other unit of state government authorized or required by any statute or constitutional provision to make rules or to determine contested cases[.]"). The UAPA "requires a state agency in Tennessee to follow uniform procedures when making rules." *Abdur'Rahman v. Bredesen*, 181 S.W.3d 292, 311 (Tenn. 2005). The UAPA requires rules to be promulgated with public notice, a public hearing, approval by the attorney general, and filing with the secretary of state, among other things. Tenn. Code Ann. §§ 4-5-202, -203, -206, -211. When describing the practical application of the UAPA's rule-making process, William Aaron, TennCare's Chief Financial Officer stated in his declaration:

> In my experience, the rule-making process takes approximately six to nine months. This includes rule drafting, obtaining required approvals, public posting, rule-making hearing and the hearing before the Joint Government Operations Committee of [] Tennessee. In addition, while the Joint Operations Committee can only provide a positive or negative

- 7 -

recommendation, the Tennessee General Assembly also annually reaffirms the existence of all executive branch rules through legislation.

The UAPA expressly provides that "[a]ny agency rule not adopted in compliance with this chapter shall be void and of no effect and shall not be effective against any person or party nor shall it be invoked by the agency for any purpose." Tenn. Code Ann. § 4-5-216.

The term "rule"[4] is a statutorily defined term under the UAPA meaning an "agency statement *of general applicability* that implements or prescribes law or policy[[5]] or describes the procedures or practice requirements of any agency. . . ." Tenn. Code Ann. § 4-5-102(12) (2009) (emphasis added). However, a "rule" does not include "[s]tatements concerning only the *internal management* of state government and *not affecting private rights, privileges or procedures available to the public*[.]" Tenn. Code Ann. § 4-5-102(12)(A) (2009) (emphasis added). "Accordingly, a policy is not a rule under the UAPA if the policy concerns internal management of state government *and* if the policy does not affect the private rights, privileges, or procedures available to the public." *Mandela v. Campbell*, 978 S.W.2d 531, 534 (Tenn. 1998) (emphasis in original).

Thus, the threshold question on appeal is whether TennCare's $50 Cap on emergency room physician reimbursements constitutes a "rule" under the UAPA. The trial court correctly determined that "[i]f it is not a rule, then the rest of the issues are moot and summary judgment must be denied." First, we must determine whether the $50 Cap is a statement of "general applicability" and, if so, we must then examine whether it is subject to the internal management exception under the UAPA.

A. Is the $50 Cap a "statement of general applicability"?

TennCare insists that the $50 Cap is not a statement of general applicability because it applies only to PPPA-contracted, emergency-room providers who render non-emergent services.[6] In other words, TennCare suggests that because the $50 Cap does not apply to

---

[4] The General Assembly amended the definition of a "rule" in 2018. 2018 TENN. PUB. ACTS, ch. 929. The $50 Cap was instituted in 2011; therefore, the Court finds, and the parties agree, that the 2009 version of the UAPA applies here. All references throughout the opinion are to the 2009 version of the UAPA.

[5] The 2009 version of the UAPA defines "policy" as "a set of decisions, procedures and practices pertaining to the internal operation or actions of an agency[.]" Tenn. Code Ann. § 4-5-102(10) (2009).

[6] We note, however, that initially, via its April 2011 letter, TennCare indicated that rule-making was required in order to promulgate this reduction in reimbursement to emergency room physicians. Indeed, Keith Gaither, TennCare's Director of Managed Care Operations and TennCare's designated Tenn. R. Civ. P. 30.02(6) deponent, testified as follows regarding TennCare's initial announcement that it would engage in emergency rule-making:

> Q. What were the facts that led TennCare to make that initial decision that it was going to engage in - - promulgate emergency rules before July 1, requiring that these cuts be made?

"all" healthcare providers or "all" emergency room physicians, it is not generally applicable. In contrast, the trial court held that the $50 Cap is a statement of general applicability "not only because it applies to all MCOs, but also that it potentially affects all providers." In support of this holding, the trial court cites the Emergency Medical Treatment and Labor Act, 42 U.S.C. §1395dd ("EMTALA").

As an initial matter, we find no support for TennCare's assertion that the $50 Cap must apply to "all healthcare providers" to be a statement of general applicability and meet the definition of a "rule" under the UAPA. A review of other TennCare rules and regulations promulgated under the UAPA belies this assertion. For example, Tenn. Comp. R. & Reg. 1200-13-21-.04(1)(a)(3)[7] is a TennCare rule that applies only to "primary care providers" and not to all healthcare providers. We agree with the trial court that TennCare cannot simply ignore UAPA rule-making requirements by making statements applicable to a certain subset of healthcare providers on a class-by-class basis.

Next, TennCare asserts that the $50 Cap is not "generally applicable" because it does not apply to all emergency-room providers. TennCare further asserts that the trial court erred when it considered EMTALA when analyzing whether the $50 Cap was "generally applicable." We disagree. Our Supreme Court has described EMTALA as follows:

> In 1986, Congress enacted the federal Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd, as part of the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) (codified in various places in Title 42 of the United States Code). The purpose of EMTALA was to prohibit "patient dumping," that is, "the practice of a hospital that, despite its capability to provide needed medical care, either refuses to see or transfers a patient to another institution because of the patient's inability to pay." *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 873 n.1 (4th Cir. 1992); *see also Beller v. Health and Hosp. Corp. of Marion*

---

A. Again, we don't have any direct documents, so I don't know the specific reasons why.
Q. Well, what was your understanding of the facts that required it?
A. I think it could be inferred that we thought rules were necessary because they were impacting reimbursement.
Q. In other words, you were cutting somebody's pay?
A. Yes.

Of course, TennCare's initial thoughts, prior to the enactment of the Appropriation Act, regarding rule-making are not binding on this or any court. The proper interpretation of the UAPA is a question of law for the courts. *See Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 924 (Tenn. 1998) ("Construction of a statute is a question of law.").

[7] Tenn. Comp. R. & Reg. 1200-13-21-.04(1)(a)(3) states, in part, "If after notification of enrollment the enrollee has not chosen a primary care provider (PCP), one will be selected for him by the MCO."

*Cnty., Ind.*, 703 F.3d 388, 390 (7th Cir. 2012). To this end, when a person without the ability to pay for medical services presents to a hospital's emergency room, EMTALA requires the hospital to first provide screening to ascertain whether the person has an "emergency medical condition." [footnote omitted] If the hospital determines that the person has an emergency medical condition, the hospital must provide such treatment as is necessary to either stabilize the patient or transfer the patient to another facility. *Beller*, 703 F.3d at 390.

*Chattanooga-Hamilton Cnty. Hosp. Auth. v. UnitedHealthcare Plan of the River Valley, Inc.*, 475 S.W.3d 746, 750 (Tenn. 2015) (footnote omitted). Pursuant to EMTALA, emergency department physicians are required to administer services to any patient who presents to the emergency department, including TennCare patients, regardless of whether it is later determined that the patient's medical needs were "non-emergent." *See River Park Hosp., Inc.*, 173 S.W.3d at 48-49 ("[A] hospital must provide services to a person with an emergency medical condition until the person's condition has stabilized, without regard to whether the person has insurance."). Thus, the practical application of EMTALA undermines TennCare's position that the $50 Cap does not apply to all emergency room providers. Rather, EMTALA requires all emergency room physicians to provide services to every patient, including TennCare patients, who present to the emergency room, and the $50 Cap will apply to all emergency room physicians who treat TennCare patients with non-emergent conditions.

TennCare also attempts to avoid the general applicability label by comparing the $50 Cap to a TennCare policy and procedure manual this Court examined in *Heritage Early Childhood Development Center, Inc. v. Tennessee Department of Human Services*, No. M2008-02134-COA-R3-CV, 2009 WL 3029595 (Tenn. Ct. App. Sept. 22, 2009). However, the facts and circumstances in *Heritage* support a finding that the $50 Cap is "generally applicable" just as the policy and procedure manual was in *Heritage*. In *Heritage*, this Court considered whether a policy and procedure manual that applied only to child care centers participating in a federally-funded, state-operated program that provided child care assistance to low-income working parents met the statutory definition of a rule under the UAPA. *Id.*, at \*1-2 (Tenn. Ct. App. Sept. 22, 2009). The policy and procedure manual addressed, *inter alia*:

> [S]ubstantive procedures that the petitioners and all participating child care centers must follow concerning attendances and absences of each child participating in the Program, rates the providers may charge, procedures for the transfer of children from one provider to another, and capacity limitations, among other provisions that do not apply to internal operating procedures of the Department.

- 10 -

*Id.*, at \*8. Regardless of the content of the manual, it only applied to child care providers that participated in the federal program; there were non-participating child care providers throughout the state to which the manual did not apply. *Id.* Thus, even though the policy and procedure manual did not apply to "all" child care providers in the state, the manual was held to be a rule under the UAPA because it described the procedures for which a licensed child care center may be terminated from participating in a federally funded program. *Id.*

Here, the $50 Cap applies to all emergency room physicians across the state who provide care to TennCare patients with non-emergent medical conditions. Therefore, we agree with the trial court and EMCF that the $50 Cap is an "agency statement of general applicability." This does not conclude our analysis, however, because we must determine whether the internal management exception applies to the $50 Cap.

B. <u>Does the $50 Cap fall within the "internal management" exception?</u>

The $50 Cap is not a rule if it "concerns internal management of state government *and* . . . does not affect the private rights, privileges, or procedures available to the public[8]." *Mandela*, 978 S.W.2d at 534 (emphasis in original). Relying on *Tennessee Community Organizations v. Tennessee Department of Intellectual & Developmental Disabilities*, No. M2017-00991-COA-R3-CV, 2018 WL 2175818 (Tenn. Ct. App. May 11, 2018), TennCare asserts that the $50 Cap concerns only internal management of state government and does not affect the public. The trial court found *Tennessee Community* did not control the outcome in this case.

In *Tennessee Community*, two long-term care providers contracted with the Tennessee Department of Intellectual and Developmental Disabilities ("TDIDD") to provide home and community-based services to recipients through a federal waiver. *Id.* at \*1. Under this arrangement, the long-term care providers were limited to providing services "a maximum of 5 days per week up to a maximum of 243 days per person per calendar year" and were required to comply with TDIDD's Provider Manual. *Id.* TDIDD's Provider Manual imposed sanctions, including financial penalties, against contracted entities for certain violations. *Id.* at \*1-2. The long-term care providers at issue billed services in excess of the number of days allowed and were sanctioned for their billing practices. *Id.* at \*2. The long-term care providers filed a petition for declaratory judgment asking the trial court to declare any sanctions imposed invalid, arguing, in part, that the sanctions outlined in the Provider Manual constituted an invalidly promulgated rule under the UAPA. *Id.* The trial court granted summary judgment to the TDIDD, finding that the policy on sanctions in the Provider Manual was not invalidly promulgated because it fell within the internal management exception of Tenn. Code Ann. § 4-5-102(12)(A) (2009).

---

[8] Public means "[o]f, relating to, or involving an entire community, state, or country" or "[o]pen or available for all to use, share, or enjoy." BLACK'S LAW DICTIONARY (11th ed. 2019).

*Id.* at *12-13. This Court affirmed the trial court, holding that the internal management exception applied because the TDIDD Provider Manual's policies narrowly applied to TDIDD employees and to contracted entities, the manual did not "address or bear on private rights, privileges or procedures available to the public." *Id.* at 13.

We find the $50 Cap TennCare imposed in this case to be similar to the TDIDD Provider Manual's sanction policies in *Tennessee Community*, because the $50 Cap TennCare imposed does not address or bear on procedures available to the public nor does it affect entities other than those under contract with TennCare. As relevant here, the Participating Provider Agreement that EMCF and TennCare entered into states, in relevant part: "The Provider or Provider Entity will accept the Medicaid/TennCare payment plus any applicable patient liability as payment in full. Provider or Provider Entity acknowledges that federal law precludes payment for any services for which Federal Financial Participation is not available." The record is devoid of any evidence that the $50 Cap affects TennCare enrollees or other members of the public. The only entities impacted by the $50 Cap are those in privity with TennCare. In its brief, EMCF states that "by capping payments to ED providers, the $50 Cap has obvious downstream effects that impact more than just Medicaid participating ED providers." However, EMCF provides no citation to any evidence in the record to define and substantiate the existence of these downstream effects. *See* Tenn. R. App. P. 27(a)(7)(A) (requiring appropriate references to the record to support contentions); *see also* Tenn. R. Ct. App. 6(b) ("No assertion of fact will be considered on appeal unless the argument contains a reference to the page or pages of the record where evidence of such fact is recorded.").

A review of the policy and procedure manual in *Heritage*, which was held to be a rule requiring rule-making procedures, is in accord with this conclusion. In *Heritage*, the internal management exception did not apply because the policy and procedure manual contained agency statements that applied to the public. *Heritage Early Childhood Dev. Ctr., Inc.*, 2009 WL 3029595, at *8. The *Heritage* Court specifically noted that the policies "affect the parents of eligible children." *Id.* at *5. The policy and procedure manual in *Heritage* affected the public. Unlike the manual in *Heritage*, the $50 Cap only applies to entities in privity with TennCare, such as EMCF under the Provider Participation Agreement; there is nothing to indicate it affects the "public."

In rendering its decision that the $50 Cap was a rule under the UAPA, the trial court cited *Chattanooga-Hamilton County Hospital Authority v. UnitedHealthcare Plan of the River Valley, Inc.*, 475 S.W.3d 746, 752 (Tenn. 2015) and focused on TennCare regulations referred to as the "74% Rule" and the "57% Rule" that were at issue in that case. The trouble with the trial court's reliance on that opinion is that it did not require examination of the UAPA definition of a rule or make any determination regarding whether the "74% Rule" or the "57% Rule" were improperly promulgated. *Id.* at 756-67. The central issues in the *Chattanooga-Hamilton* case involved exhaustion of administrative remedies. *Id.* at 760. Therefore, *Chattanooga-Hamilton County Hospital Authority* is not analogous to the

issues before us in this appeal and not helpful to our resolution on the issues presented in this case.

It is argued that Tennessee Code Annotated section 71-5-105(a)(3)(A) requires TennCare to establish rules in this instance. We disagree. Tennessee Code Annotated section 71-5-105(a)(3)(A) requires TennCare to establish, "in consultation with the comptroller of the treasury, rules and regulations for the determination of payment for hospitals, and other health care providers who contract with" TennCare. In our opinion, this statute requires rules to establish what documentation is necessary to authorize payment. An examination of TennCare's rules show that this statute is cited in reference to audits of providers. *See* Tenn. Comp. R. & Reg. 1200-13-18-.02(4) ("Audits are conducted in accordance with AICPA (American Institute of Certified Public Accountants) auditing or attestation engagement standards. For purpose of this chapter, audits are conducted of health care provider records, financial information, and statistical data . . . .") and 1200-13-18-.04(1) ("The Bureau is required by state and federal law to protect the integrity of the Medicaid program. This is accomplished in part by causing audits of provider claims to be conducted. Audit findings are reported to the Bureau for the purpose of recovering incorrect payments, by recoupment or withhold."). The requirements of Tennessee Code Annotated section 71-5-105(a)(3)(A) reflect the audit authority of the comptroller of the treasury. Tenn. Code Ann. §§ 4-3-304(1), 8-4-109, 111, and 116; *see also* Provider Payment and Participation Agreement, ₱₱ 5, 9, 10, and 11. There are certainly some agency statements regarding the "determination of payment for hospitals, and other health care providers" that must be promulgated under the UAPA rule-making requirements. However, Tenn. Code Ann. § 71-5-105(a)(3)(A) does not require rule-making in this instance.

In light of the precedent in *Tennessee Community*, which has informed our interpretation of the internal management exception, we find that the internal management exception applies to the $50 Cap because the $50 Cap only impacts entities in privity with TennCare and "does not affect the private rights, privileges, or procedures available to the public." Therefore, we conclude that the trial court erred in granting summary judgment on the UAPA issues to EMCF. Our holding that the $50 Cap does not meet the definition of a "rule" under the 2009 version of the UAPA, renders any other statutory authority cited by the parties in this appeal irrelevant.

CONCLUSION

The $50 Cap implemented by TennCare is not a rule as defined by the 2009 version of the UAPA because it is subject to the internal management exception at Tenn. Code Ann. § 4-5-102(12)(A) (2009). Thus, the judgment of the trial court is reversed and the case is remanded. EMCF may continue litigating the remaining issues raised in its initial

summary judgment motion.  The costs of this appeal are assessed against the Appellee, for which execution may issue if necessary.


_/s/ *Andy D. Bennett*_____
ANDY D. BENNETT, JUDGE