FILED

05/21/2025

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 10, 2024 Session

## THE CHATTANOOGA-HAMILTON COUNTY HOSPITAL AUTHORITY
### V. DIVISION OF TENNCARE, ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 21-1150-II    Anne C. Martin, Chancellor**

_____

### No. M2023-01350-COA-R3-CV

_____

A hospital system that was the aggrieved party in this contested case before The Division of TennCare, Department of Finance and Administration sought judicial review of the agency's decision upholding the validity of two TennCare rules. The two rules regulate reimbursement rates for emergency services provided to Tennessee's Medicaid beneficiaries when the provider of those emergency services does not have a contract with the managed care organizations that insure the beneficiaries. The Davidson County Chancery Court reversed the agency's decision and held that the two rules were invalid and void *ab initio*. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

Jonathan Skrmetti, Attorney General and Reporter; Andrée Sophia Blumstein, Solicitor General; Reed N. Smith, Assistant Attorney General; and Meredith Wood Bowen, Senior Assistant Attorney General, for the appellant, Division of TennCare, Department of Finance and Administration.

Steven Allen Riley, Gregory S. Reynolds, James Nathaniel Bowen, II, Joshua S. Bolian, and Grace Cooley Peck, Nashville, Tennessee, for the appellee, The Chattanooga-Hamilton County Hospital Authority d/b/a Erlanger Health System.

**OPINION**

## I.     BACKGROUND

Petitioner-Appellee, The Chattanooga-Hamilton County Hospital Authority d/b/a Erlanger Health System ("Erlanger"), is a not-for-profit tertiary care hospital system headquartered in Chattanooga, Tennessee. Erlanger is a teaching hospital and operates a Level I trauma center.

In 1965, federal legislation established Medicaid, a federal-state program that provides federal funding for medical and health-related services to low-income individuals. The federal government shares the costs of Medicaid with a participating state, subject to federal requirements. TennCare is the State of Tennessee's Medicaid program, and federal funding pays for approximately two-thirds of the program's expenses. TennCare maintains a "State plan" which is "a comprehensive written statement submitted by the agency describing the nature and scope of [the state's] Medicaid program and giving assurance that it will be administered in conformity with the specific requirements of [applicable federal law]." 42 C.F.R. § 430.10.[1] "Medicaid agency or agency means the single State agency administering or supervising the administration of a State Medicaid plan." 42 C.F.R. § 400.203. The Tennessee Department of Finance and Administration's Division of TennCare is the state agency tasked with administering the TennCare program and is the Respondent-Appellant in this litigation.

The original 1960s Medicaid model was fee-for-service. In a fee-for-service model, a state's Medicaid program pays health care providers directly for services given to eligible individuals. The state establishes the reimbursement rates for services provided to Medicaid enrollees. *See River Park Hosp., Inc. v. BlueCross BlueShield of Tennessee, Inc.*, 173 S.W.3d 43, 48 (Tenn. Ct. App. 2002). This is how Tennessee's Medicaid program operated before 1994. States may obtain waivers of State Plan requirements. *See* 42 U.S.C. § 1315(a) (allowing federal government to waive requirements). The modern TennCare program was established in 1994 and implemented through a demonstration project waiver proposed by Tennessee's governor and approved by the federal government. The waiver has been renewed several times. Despite the waiver, Tennessee, through TennCare, formally maintains a State Plan.

Since 1994, TennCare has operated the program as a managed care model. As such, the State and private insurance companies known as managed care organizations ("MCOs") are contractually bound by contractor risk agreements. *River Park*, 173 S.W.3d at 48. Under the risk agreements, the State pays an MCO a monthly payment known as a

---

[1] Sources cited throughout this Opinion use the terms "State plan," "state plan," and "State Plan" interchangeably.

"capitation payment" for each eligible individual enrolled with that MCO. *Id*. In turn, the MCO arranges for the provision of health care services to eligible TennCare recipients who choose to enroll with that MCO. *Chattanooga-Hamilton Cnty. Hosp. Auth. v. UnitedHealthcare Plan of the River Valley, Inc.*, 475 S.W.3d 746, 749 (Tenn. 2015) ("*UnitedHealthcare*").

The MCOs develop a network of "in-network providers" or "participating providers," such as doctors and hospitals, who render medical services at rates negotiated between the MCO and the provider. These rates are confidential. "An MCO will generally aim to reduce costs by negotiating with the healthcare providers in its network to accept discounted rates for the services provided to the MCO's enrollees." *Id.* at 750. If the MCO pays more to providers than it receives in capitation payments from TennCare, the MCO, not TennCare, bears the loss. *River Park*, 173 S.W.3d at 48. Providers that do not have a contract with an MCO but nevertheless provide services to the MCO's enrollees are referred to as "non-participating" or "non-contract" providers. *UnitedHealthcare*, 475 S.W.3d at 750. Alternatively, they are referred to as "out-of-network providers." *Emergency Med. Care Facilities, P.C. v. Div. of TennCare*, 671 S.W.3d 507, 511 (Tenn. 2023).

Pursuant to the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd ("EMTALA"), a hospital such as Erlanger must treat someone experiencing an emergency medical condition until the condition has stabilized and regardless of that person's insurance status or ability to pay. From January 1, 2009, through February 28, 2015, Erlanger was out-of-network with a large TennCare MCO named UnitedHealthcare Plan of the River Valley, Inc. d/b/a AmeriChoice. During this period, Erlanger continued to provide the services required by EMTALA to AmeriChoice enrollees even though there was no contract specifying how AmeriChoice would pay Erlanger. EMTALA itself did not set reimbursement rates for out-of-network hospitals that provide EMTALA-required services to Medicaid enrollees.

In 2005, Congress enacted the Deficit Reduction Act of 2005 which, among other things, established a limit on the amount that Medicaid MCOs could pay non-contract providers for emergency services:

> Any provider of emergency services that does not have in effect a contract with a Medicaid managed care entity that establishes payment amounts for services furnished to a beneficiary enrolled in the entity's Medicaid managed care plan must accept as payment in full no more than the amounts (less any payments for indirect costs of medical education and direct costs of graduate medical education) that it could collect if the beneficiary received medical assistance under this subchapter other than through enrollment in such an

entity. In a State where rates paid to hospitals under the State plan are negotiated by contract and not publicly released, the payment amount applicable under this subparagraph shall be the average contract rate that would apply under the State plan for general acute care hospitals or the average contract rate that would apply under such plan for tertiary hospitals.

Deficit Reduction Act of 2005, Pub. L. No. 109-171, § 6085(a), 120 Stat. 4, 121 (2006) (codified at 42 U.S.C. § 1396u-2(b)(2)(D)) (the "Federal DRA"). The Federal DRA took effect on January 1, 2007. *Id.* § 6085(b).

Because it was a managed care model, TennCare did not have fee-for-service rates when the Federal DRA took effect.[2] Rather, its "State Plan" contained an inpatient per diem for services and did not set a rate specifically for inpatient emergency services. At the time the Federal DRA was enacted, there existed a TennCare rule requiring that for emergency services provided to a TennCare enrollee by an out-of-network provider, the MCO "shall reimburse the provider at the rate of 100% of the lowest rate paid to the [MCO's] network providers." Tenn. Comp. R. & Regs. 1200-13-13-.08(2) (2005). As detailed below, this rule was eventually replaced with the two TennCare rules regulating payment by MCOs that are at issue in the instant appeal. The Federal DRA prompted TennCare to issue memoranda in February and March of 2007 seeking input from TennCare stakeholders about amending the State Plan and complying with the Federal DRA.

In April 2007, the Tennessee Hospital Association proposed a draft bill to the Tennessee General Assembly with the following language:

Hospitals that do not have in effect a contract with a managed care entity that establishes payment amounts for services furnished to TennCare enrollees shall be paid for emergency services the average contract rate that would apply for general acute care hospitals.

TennCare advised the General Assembly that, as written, the bill would increase State expenditures by over three million dollars and would increase federal expenditures by over five million dollars. TennCare and the Tennessee Hospital Association negotiated changes to the draft bill. Proposed amendments were reviewed in the General Assembly, including by the Fiscal Review Committee. Ultimately, the General Assembly enacted Tennessee Code Annotated section 71-5-108, entitled "State plan amendment; payment methodology." This statute, referred to in this litigation as the "State DRA," provides:

---

[2] Again, in Tennessee, the State makes capitation payments to MCOs rather than paying providers.

The TennCare bureau is directed to submit a state plan amendment to the centers for medicare and medicaid services that sets out a payment methodology for medicaid enrollees who are not also enrolled in medicare, consistent with provisions in § 6085 of the federal Deficit Reduction Act of 2005, regarding emergency services furnished by noncontract providers for managed care enrollees. The payment amount shall be *the average contract rate* that would apply under the state plan for general acute care hospitals. A tiered grouping of hospitals by size or services may be utilized to administer these payments. The payment methodology developed pursuant to this section shall be budget neutral for the state fiscal year 2007–2008 when compared to the actual experience for emergency services furnished by non-contract providers for medicaid managed care enrollees prior to January 1, 2007. It is the intent that this section only applies to the emergency services furnished by non-contract providers for medicaid managed care enrollees.

Tenn. Code Ann. § 71-5-108 (emphasis added). The statute took effect on June 11, 2007, and has not been amended since.

Pursuant to the State DRA's directive, TennCare submitted to the Centers for Medicare and Medicaid Services ("CMS") a state plan amendment ("SPA").[3] TennCare proposed its amendment in September 2007, and it was assigned tracking number 07-003. The language of proposed SPA 07-003 reflected the rule that was in place at that time, *i.e.*, it would have required MCOs to pay out-of-network hospitals "one hundred percent (100%) of the lowest contracted rate for emergency services provided at in-network general acute care hospitals." CMS rejected proposed SPA 07-003. CMS advised that the "language that indicates the rates to be paid for emergency services will be the lowest contracted rates for emergency services provided to in-network general acute care hospitals" was "not comprehensive enough to determine how the rates will be determined and must be amended to provide this level of detail." CMS further indicated that the amendment "must be comprehensive enough to determine the required level of [Federal Financial Participation] and to allow interested parties to understand the rate setting process and the items and services that are paid through these rates." CMS also advised that the rate should not be included in Section 4.19-A of the State Plan, which provides methods for establishing payment rates for inpatient hospital services, and instead it should be included in Section 4.19-B, which pertains to outpatient services. Based on such feedback, TennCare withdrew SPA 07-003.

---

[3] "CMS, previously known as the Health Care Financing Administration, is a federal agency within the Department of Health and Human Services that works in partnership with state governments to administer the Medicaid program and other programs." *UnitedHealthcare*, 475 S.W.3d at 751 n.7.

Then, TennCare submitted SPA 08-003 to CMS. TennCare reclassified the amendment under the outpatient portion of the State plan. To get to the payment methodology, TennCare's Chief Financial Officer requested information about the lowest in-network contract rate for five CPT codes[4] associated with outpatient emergency services from TennCare's three largest health plans. He then converted the average of those rates to a percentage of federal Medicare rates, which are available to the public. This resulted in the payment methodology of 74% of the 2006 Medicare rates for those services. In its responses to interrogatories, TennCare explained:

> The 74% rate establishes a payment amount that equates, as a percentage of 2006 Medicare rates, to the approximate average of the lowest contract rate that TennCare [MCOs] paid in-network providers for providing outpatient emergency services under [certain CPT codes].

TennCare placed notices about the pending change in the newspaper but did not go through the rulemaking process set forth in the Uniform Administrative Procedures Act ("UAPA"). CMS approved SPA 08-003. It was effective as of February 1, 2008 and states:

> Covered medically necessary emergency services, when provided to Medicaid managed care enrollees by non-contract hospitals in accordance with Section 1932(b)(2)(D) of the Social Security Act [*i.e.*, the Federal DRA], shall be reimbursed at 74 percent of the 2006 Medicare rates for those services. This methodology does not apply to Medicare crossover claims, which are paid in accordance with Attachment 4.19B, Section 24.

TennCare sought to promulgate a rule reflecting the above 74% payment methodology. TennCare filed a notice of rulemaking hearing with the Secretary of State. TennCare failed to cite the State DRA in the rulemaking forms it filed with the Secretary of State. On September 15, 2008, TennCare published notice of the proposed rule in the Tennessee Administrative Register. On October 16, 2008, TennCare conducted a rulemaking hearing as required by the UAPA. No interested parties besides TennCare representatives attended. TennCare did not receive any comments related to the proposed 74% rule. The Tennessee Attorney General approved the proposed rule. TennCare filed the proposed rule with the Secretary of State. On April 27, 2009, the Government Operations Committee reviewed the proposed rule and approved it with a positive recommendation. As codified, the rule reflecting the 74% payment methodology in SPA 08-003 provides:

---

[4] A CPT (Current Procedural Terminology) code is a five-digit code used for billing and administrative purposes by providers to report medical procedures, services, and tests performed on patients.

Covered medically necessary outpatient emergency services, when provided to Medicaid managed care enrollees by non-contract hospitals in accordance with Section 1932(b)(2)(D) of the Social Security Act (42 U.S.C.A. § 1396u-2(b)(2)(D)), shall be reimbursed at seventy-four percent (74%) of the 2006 Medicare rates for these services. Emergency care to enrollees shall not require preauthorization.

Tenn. Comp. R. & Regs. 1200-13-13-.08(2)(b) (the "74% Rule"). The 74% Rule took effect on May 11, 2009, and has not been amended since.

Thereafter, TennCare submitted to CMS SPA 10-003 concerning inpatient hospital admissions required as a result of emergency outpatient services. As it did before with SPA 08-003, TennCare requested its MCOs to provide the lowest in-network rate for inpatient services and calculated an average of the amounts received. TennCare then converted this average to a percentage of Medicare rates, resulting in a payment methodology for out-of-network inpatient admissions resulting from outpatient emergency services of 57% of 2008 Medicare rates. TennCare explained, "The 57% rate establishes a payment amount that equates, as a percentage of 2008 Medicare rates, to the approximate weighted average of the lowest contract rates that TennCare MCOs paid in-network providers for providing applicable inpatient services in or around 2010." Again, TennCare placed notices about the pending change in the newspaper but did not go through the rulemaking process set forth in the UAPA. CMS approved SPA 10-003. It was effective as of March 17, 2010, and states:

Covered medically necessary admissions required as the result of emergency outpatient services, when provided to Medicaid managed care enrollees by non-contract hospitals in accordance with Section 1932(b)(2)(B) of the Social Security Act, shall be reimbursed at 57 percent of the 2008 Medicare Diagnostic Related Groups (DRG) rates determined in accordance with 42 CFR 412 for those services. For DRG codes that are adopted after 2008, 57% of the rate from the year of adoption will apply. These inpatient stays will continue until they are no longer medically necessary or until the patient can be safely transported to a contract hospital or to another contract service, whichever comes first. This methodology does not apply to Medicare crossover claims, which are paid in accordance with Attachment 4.19B, Section 24.

TennCare sought to promulgate a rule reflecting the above 57% payment methodology. TennCare filed a notice of rulemaking hearing and went through emergency

rulemaking.[5]  It held the required public hearing for the proposed 57% rule on October 21, 2010.  No one besides TennCare representatives attended.  The Tennessee Attorney General approved the rule.  TennCare filed the rule with the Secretary of State.  TennCare failed to cite the State DRA in the rulemaking forms it filed with the Secretary of State.  On March 28, 2011, the Government Operations Committee reviewed the proposed rule.  TennCare's former Chief Medical Officer, Dr. Long, testified "to pay more [than the 57% rate], we would have to have an appropriation [from the General Assembly].  There would be a cost associated with paying more than we've ever paid since the inception of TennCare."  The Government Operations Committee voted to disallow the rule, which allowed it to go into effect, but only until the vote on the rules omnibus bill.  This option was intended to allow TennCare to proceed and to give the General Assembly a chance to appropriate necessary funds to do something different than the 57% rule.  The General Assembly did not appropriate additional funds related to it.  As codified, the rule reflecting the 57% payment methodology in SPA 10-003 provides:

> Covered medically necessary inpatient hospital admissions required as the result of emergency outpatient services, when provided to Medicaid managed care enrollees by non-contract hospitals in accordance with Section 1932(b)(2)(B) of the Social Security Act (42 U.S.C.A. § 1396u-2(b)(2)(B)), shall be reimbursed at 57 percent of the 2008 Medicare Diagnostic Related Groups (DRG) rates (excluding Medical Education and Disproportionate Share components) determined in accordance with 42 C.F.R. § 412 for those services.  For DRG codes that are adopted after 2008, 57 percent of the rate from the year of adoption will apply.  Such an inpatient stay will continue until no longer medically necessary or until the patient can be safely transported to a contract hospital or to another contract service, whichever comes first.

Tenn. Comp. R. & Regs. 1200-13-13-.08(2)(c) (the "57% Rule").  The permanent 57% Rule took effect on March 29, 2011, and has not been amended since.

Again, from January 1, 2009, through February 28, 2015, Erlanger was out-of-network with AmeriChoice, a large TennCare MCO.  A dispute arose about the rates AmeriChoice was required to pay Erlanger for the out-of-network, EMTALA-mandated services Erlanger was providing to AmeriChoice enrollees.  In June 2009, Erlanger sued AmeriChoice in the Chancery Court for Davidson County ("trial court").

---

[5] The UAPA "gives agencies authority to promulgate emergency rules in certain enumerated circumstances.  *See* Tenn. Code Ann. § 4-5-208.  Emergency rules 'become effective immediately' but lapse after 180 days.  *Id*. § 4-5-208(b).  To make the rule permanent, the agency must promulgate the rule through ordinary rulemaking procedures.  *See id*."  *Emergency Med*., 671 S.W.3d at 511 n.2.

*UnitedHealthcare*, 475 S.W.3d at 753. Citing the State DRA, Erlanger "alleged that AmeriChoice was obligated to pay at least the 'average contract rate' payable for EMTALA-mandated services." *Id*. AmeriChoice answered that it had paid Erlanger all that was due under TennCare regulations (the 74% Rule and the 57% Rule). AmeriChoice also asserted that Erlanger's complaint, "in effect, challenged the applicability and/or validity of" the TennCare regulations. *Id*. Upon review, the Tennessee Supreme Court reasoned:

> Erlanger's request for a ruling that it is entitled to 'the average contract rate' under the [State] DRA or Section 71-5-108 is in effect a request for a ruling that the TennCare Rules are invalid or inapplicable because they are inconsistent with the statutes. This triggers the UAPA's requirement of exhaustion of administrative remedies.

*Id*. at 757. The Supreme Court held that Erlanger was required to exhaust its administrative remedies with TennCare before the courts could resolve Erlanger's dispute with AmeriChoice. *See id*. at 766.

To initiate the administrative proceedings underlying this appeal, in April 2017, Erlanger petitioned TennCare for a "declaratory order and declaratory judgment" that the 74% Rule and the 57% Rule violate the State DRA "to the extent those Rules purport to establish the maximum compensation rate for out-of-network providers who provide services required by EMTALA."[6] On January 9, 2018, Erlanger filed an amended petition for a declaratory order before TennCare. The amended petition again sought a declaration that the 74% Rule and the 57% Rule were invalid because they failed to comply with the State DRA in that "the payment amounts established under the Rules do not equal 'the average contract rate that would apply under the state plan for general acute care hospitals.'" The amended petition further requested a declaration that SPAs 08-003 and 10-003 violated the State DRA.[7]

On December 11, 2017, TennCare's designated Tennessee Rule of Civil Procedure 30.02(6) representative testified:

---

[6] "Any affected person may petition an agency for a declaratory order as to the validity or applicability of a statute, rule or order within the primary jurisdiction of the agency." Tenn. Code Ann. § 4-5-223(a).

[7] TennCare dismissed Erlanger's challenge to SPA 08-003 and SPA 10-003, so Erlanger filed a complaint for declaratory judgment in the trial court. We address TennCare's appeal from the judgment in that action in our Opinion rendered in *The Chattanooga-Hamilton County Hospital Authority d/b/a Erlanger Health System v. Division of TennCare, Department of Finance and Administration, et al*., No. M2023-01619-COA-R3-CV.

Q. Instead of amending the state plan to provide rates for out-of-network providers of emergency care, rates that would approximate the average contract rate paid to in-network providers for those same services, TennCare chose to do something different, didn't it?

A. Yes.

Q. And what TennCare chose to do was to provide a specific rate that was static and would never increase, right?

A. Correct.

Q. And that static rate that TennCare chose to impose ensured that at most out-of-network providers of emergency care in Tennessee would receive the lowest contract rates paid to in-network providers for those same services, correct?

A. Correct.

By declaratory order entered September 20, 2021, TennCare's Commissioner's Designee found that the State DRA was ambiguous, concluded that the 74% Rule and the 57% Rule do not violate the State DRA, and denied Erlanger's amended petition.

Pursuant to Tennessee Code Annotated sections 4-5-223 and 4-5-322, on November 12, 2021, Erlanger petitioned the trial court for judicial review and reversal of the Commissioner's Designee's declaratory order.[8] The parties submitted briefs and the trial court heard arguments on July 13, 2023. By order entered August 24, 2023, the trial court reversed the Commissioner's Designee's decision and held that the 74% Rule and the 57% Rule were "invalid and void *ab initio*" for two reasons. First, the trial court found the State DRA to be "clear and unambiguous." The court reasoned, "using the natural and ordinary meaning of the words, the State DRA requires the 'average contract rate,' while [SPA 08-003 and SPA 10-003] and [the] corresponding Rules are based on an 'arithmetic average' of the *lowest* in-network rates from the MCOs. Thus, the Rules violate the State DRA." Second, the court found that by failing to cite the State DRA in its submissions to the Secretary of State, TennCare failed to follow the procedure required by the UAPA, rendering the 74% Rule and the 57% Rule void and of no effect. TennCare appealed.

---

[8] "Venue for appeals of contested case hearings involving TennCare determinations shall be in the chancery court of Davidson County." Tenn. Code Ann. § 4-5-322(b)(1)(A)(iii).

## II.    ISSUES

Appellant, the Tennessee Department of Finance and Administration's Division of TennCare, raises the following issues for review:

A. Whether Erlanger's challenge to the validity of TennCare Rules 1200-13-13-.08(2)(b) and -.08(2)(c) is foreclosed on federal preemption grounds, when the payment methodologies set forth in these rules are mandated by their inclusion in federally approved State plans.

B. Whether TennCare Rules 1200-13-13-.08(2)(b) and -.08(2)(c) are valid because they are consistent with [the State DRA].

C. Whether TennCare Rules 1200-13-13-.08(2)(b) and -.08(2)(c) are valid because they are cost-cutting measures that TennCare has plenary authority to implement.

D. Whether TennCare Rules 1200-13-13-.08(2)(b) and -.08(2)(c) were promulgated in compliance with statutory requirements and are therefore procedurally valid.

## III.    STANDARD OF REVIEW

This matter arises from a contested case hearing before TennCare, a State agency. Like the trial court, we review the Commissioner's Designee's final order pursuant to the UAPA, Tennessee Code Annotated section 4-5-322(h). We may reverse or modify the agency's decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:

(1) In violation of constitutional or statutory provisions;

(2) In excess of the statutory authority of the agency;

(3) Made upon unlawful procedure;

(4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or

(5)(A)(i) . . . Unsupported by evidence which is both substantial and material in the light of the entire record.

(ii) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact[.]

Tenn. Code Ann. § 4-5-322(h). "In interpreting a state statute or rule, a court presiding over the appeal of a judgment in a contested case shall not defer to a state agency's interpretation of the statute or rule and shall interpret the statute or rule de novo. After applying all customary tools of interpretation, the court shall resolve any remaining ambiguity against increased agency authority." Tenn. Code Ann. § 4-5-326.

## IV.    DISCUSSION

### A.

First, TennCare argues that Erlanger's challenge to the validity of the 74% Rule and the 57% Rule is foreclosed by federal preemption. TennCare contends that preemption applies because federal law requires TennCare to pay based on the CMS-approved rates, *i.e.*, the rates set forth in both the SPAs and the TennCare Rules.

Federal preemption of state law is grounded in the Supremacy Clause of the United States Constitution, which provides that the "Constitution, and the Laws of the United States . . . shall be the supreme Law of the Land. . . ." U.S. Const. art. VI, cl. 2. Generally, "the States possess sovereignty within their particular spheres concurrent with the federal government subject only to the power of the Congress under the Supremacy Clause of the United States Constitution to preempt state law." *Pendleton v. Mills*, 73 S.W.3d 115, 126 (Tenn. Ct. App. 2001) (citing *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990); *BellSouth Telecomm., Inc. v. Greer*, 972 S.W.2d 663, 670 (Tenn. Ct. App. 1997)). Consistent with this principle, a federal law or regulation may preempt a state claim. *See Lake v. Memphis Landsmen, LLC*, 405 S.W.3d 47, 55 (Tenn. 2013). Courts recognize both express and implied preemption, but "no matter what type of preemption is at issue, 'the purpose of Congress is the ultimate touchstone.'" *Id.* (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)). "In cases involving express preemption, the text of the federal statute will define the domain that Congress intended to preempt." *Pendleton*, 73 S.W.3d at 127 (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484 (1996)). Courts are "reluctant to presume" that the state's powers in matters traditionally subject to its authority "are . . . displaced by a federal statute unless that is the clear and manifest intent of Congress." *Id.* at 126. Whether

federal law preempts a state statute or common law cause of action is a question of law that we review de novo. *Lake*, 405 S.W.3d at 55.

Federal law contemplates that states will design and administer their Medicaid programs within broad federal requirements and coverage mandates. Federal law obligates TennCare to pay for medical services "using rates determined in accordance with methods and standards specified in an approved State plan." *See* 42 C.F.R. §§ 447.253(i), 447.200. TennCare argues that the payment methodologies in the 74% Rule and the 57% Rule were included in SPA 08-003 and SPA 10-003, and both SPAs were submitted to and approved by CMS. TennCare contends that SPA approvals by CMS are an exercise of federal rulemaking authority and have the force and effect of federal law, thus preempting any state law to the contrary, such as the State DRA. In TennCare's view, because federal law requires TennCare to pay based on the CMS-approved rates, *i.e.*, the rates set in both the SPAs and the Rules, it matters not if the State DRA requires a different rate. In essence, TennCare argues that CMS's approval of SPA 08-003 and SPA 10-003 ratified the payment rates in federal law notwithstanding the fact that—as detailed below and in our Opinion in case number M2023-01619-COA-R3-CV—the rates violate the payment methodology required by the State DRA under which TennCare purportedly acted in setting those rates.

We disagree. First, we note that TennCare's argument is not that the Federal DRA preempts the State DRA. Rather, TennCare argues that CMS's approval of the two SPAs preempts the State DRA if "the State DRA compels a different rate" than "the rates set forth in both the SPAs and the TennCare Rules." TennCare seems to reason that the approval by CMS made the two SPAs part of the State plan and that, in order to receive federal Medicaid funding, states must abide by their State plans. However, the fact that the payment methodologies set forth in SPAs for which TennCare sought CMS approval violate the State DRA undermines, rather than supports, the federal approval on which TennCare relies. Stretched to its limit, TennCare's argument would allow it to set any payment rate it desired, even one in contravention of a State statute, so long as CMS eventually approved.

CMS may only approve SPAs proposed to it by a state, and CMS has no authority to change State plans on its own. A State plan is a "written statement submitted *by the agency*," 42 C.F.R. § 430.10 (emphasis added), and "the agency" means the state Medicaid agency. *Id.* at § 400.203. CMS reviews State plans and State plan amendments and may approve or disapprove them. *See* 42 C.F.R. §§ 430.14–430.16. Moreover, State plans must be amended to reflect "[m]aterial changes in State law, organization, or policy, or in the State's operation of the Medicaid program." 42 C.F.R. § 430.12(c)(1)(ii). It follows that State plans and State plan amendments must comport with State law and that CMS approval does not prevent a state from changing its laws or policies related to its Medicaid program. Further, a state agency acts on behalf of Tennessee only when it is acting within

its statutory authority. *See* Tenn. Code Ann. § 4-5-103(a)(2) ("Administrative agencies shall have no inherent or common law powers, and shall only exercise the powers conferred on them by statute or by the federal or state constitutions."). As explained below, the rates set out in SPA 08-003, SPA 10-003, and the corresponding 74% and 57% Rules were different than what is mandated by the State DRA, which means that TennCare did not have authority to propose such rates to CMS. We conclude that CMS's approval of SPA 08-003 and SPA 10-003 does not preempt Erlanger from challenging the validity of the 74% Rule and the 57% Rule under the State DRA.

B.

Determining whether the 74% Rule and the 57% Rule violate the State DRA requires interpretation of that statute:

> The TennCare bureau is directed to submit a state plan amendment to the centers for medicare and medicaid services that sets out a payment methodology for medicaid enrollees who are not also enrolled in medicare, consistent with provisions in § 6085 of the federal Deficit Reduction Act of 2005, regarding emergency services furnished by noncontract providers for managed care enrollees. The payment amount shall be the average contract rate that would apply under the state plan for general acute care hospitals. A tiered grouping of hospitals by size or services may be utilized to administer these payments. The payment methodology developed pursuant to this section shall be budget neutral for the state fiscal year 2007-2008 when compared to the actual experience for emergency services furnished by non-contract providers for medicaid managed care enrollees prior to January 1, 2007. It is the intent that this section only applies to the emergency services furnished by noncontract providers for medicaid managed care enrollees.

Tenn. Code Ann. § 71-5-108. Statutory construction is a question of law that is reviewed de novo with no presumption of correctness. Tenn. Code Ann. § 4-5-326; *Thurmond v. Mid-Cumberland Infectious Disease Consultants, PLC*, 433 S.W.3d 512, 516–17 (Tenn. 2014). The Tennessee Supreme Court has provided:

> When interpreting a statute, our role is to ascertain and effectuate the legislature's intent. We must not broaden or restrict a statute's intended meaning. We also presume that the legislature intended to give each word of the statute its full effect. When statutory language is unambiguous, we accord the language its plain meaning and ordinary usage. Where the

statutory language is ambiguous, however, we consider the overall statutory scheme, the legislative history, and other sources.

*Stevens ex rel. Stevens v. Hickman Cmty. Health Care Servs., Inc*., 418 S.W.3d 547, 553 (Tenn. 2013).

Erlanger has always maintained that TennCare's actions differed from the direction provided in the State DRA because TennCare's SPAs and Rules directed payment to out-of-network providers at the lowest in-network rates, not the average contract rates. In examining the statute's plain language, we see that it unambiguously requires the "average contract rate." Tenn. Code Ann. § 71-5-108. On appeal, TennCare asserts that the contractor risk agreements between the State and MCOs "are the contracts that provide the rates 'that would apply under the State Plan.'" We disagree because the record, the State DRA's language, and the Federal DRA's language, show that the rates to use in determining the average contract rate are those in the contracts between the MCOs and providers. Such rates are those that "would apply" if the "noncontract [*i.e.*, out-of-network] providers," who are the subjects addressed in the statute, were in-network. *Id*. Indeed, it is undisputed in the record that TennCare crafted the payment methodologies by first asking its MCOs for the rates paid to providers for emergency services, albeit the lowest rates. As the trial court cogently explained, the State DRA points to the use of provider contract rates through the phrase "that would apply under the state plan." We agree with the trial court's reasoning that this phrase reflects the General Assembly's awareness at the time that the official State Plan document did not have contract rates for emergency services and mostly had been supplanted by the TennCare demonstration project waiver. So, the State DRA's reference to the "rate that would apply under the state plan for general acute care hospitals" means the rate set forth in the contracts between MCOs and in-network general acute care hospitals which "would apply" but for the TennCare waiver. The Federal DRA's language confirms this interpretation.[9] The language "average contract rate that would apply under the state plan for general acute care hospitals" appears in both statutes, but is given additional context in the Federal DRA:

> *In a State where rates paid to hospitals under the State plan are negotiated by contract and not publicly released*, the payment amount applicable under this subparagraph shall be the average contract rate that would apply under the State plan for general acute care hospitals or the average contract rate that would apply under such plan for tertiary hospitals.

---

[9] The State DRA requires the payment methodology to be "consistent with provisions in" the Federal DRA. *Id*.

42 U.S.C. § 1396u-2(b)(2)(D) (emphasis added). The word "contract" in the Federal DRA appears within the phrase "negotiated by contract and not publicly released" which refers to the contracts that MCOs and providers negotiate between themselves. *See, e.g.*, *River Park*, 173 S.W.3d at 48–49 (describing negotiations between an MCO and a provider).

The record reflects that the payment methodologies in SPA 08-003, SPA 10-003, and the corresponding 74% and 57% Rules were based on an average of the *lowest* contract rates that TennCare MCOs paid in-network providers of emergency services. This was in violation of the State DRA which mandates payment at the average contract rate. In his deposition, TennCare's representative agreed that TennCare "chose to do something different" than "amending the state plan to provide rates for out-of-network providers of emergency care, rates that would approximate the average contract rate paid to in-network providers for those same services." Because the payment methodologies fixed in the 74% and 57% Rules corresponding to SPA 08-003 and SPA 10-003 violate the State DRA, we affirm the trial court's order invalidating the Rules and reversing the Commissioner's Designee's declaratory order on this basis. *See* Tenn. Code Ann. § 4-5-322(h)(1) (agency decision subject to reversal if it violates constitutional or statutory provisions).

### C.

TennCare next argues that the 74% Rule and the 57% Rule are cost-cutting measures which fall under its broad statutory authority to control costs of the TennCare program under Tennessee Code Annotated section 71-5-102(d):

> The bureau of TennCare shall have the authority to develop and implement initiatives or program modifications to control the costs of the TennCare program to the extent permitted under federal law and the TennCare waiver. Such cost-saving measures may include, but are not limited to, the elimination of covered benefits or limitations on the scope, intensity, or duration of such benefits; implementation of cost sharing requirements for enrollees, including the medicaid population; increases in cost sharing requirements for the expansion population; enforcement of cost sharing requirements through denial of service for failure to meet co-payment requirements with alternative access to medically necessary care through established safety net providers; enforcement of collection of required co-payments by providers; reassignment of enrollees into different eligibility categories; restrictions on eligibility for non-mandatory medicaid or waiver expansion categories; and the elimination from TennCare eligibility of some or all of the non-mandatory medicaid or waiver expansion categories. The bureau of TennCare may implement a premium-assistance initiative for

persons disenrolled from TennCare. The bureau of TennCare shall also be authorized, in establishing or modifying benefits or cost sharing requirements, to define, through rules and regulations, categories of eligible enrollees who may be exempted from some or all benefit limits or cost sharing requirements, along with any requirements that must be met by such enrollees to prove or maintain exempted status. The bureau of TennCare shall have all such authority to control costs notwithstanding any other state law to the contrary.

Tenn. Code Ann. § 71-5-102(d).

The trial court found that the State DRA did not conflict with the cost-control authority granted by section 71-5-102(d), that the two statutes were not mutually exclusive, and that TennCare was not prevented "from complying with the mandates of the State DRA despite its authority to implement cost-control measures." Upon de novo review, we agree with the trial court's conclusion. Section 102(d) authorizes TennCare to pursue general cost-control initiatives for its program. The State DRA does not contradict that authorization but merely establishes what "[t]he payment amount shall be" for certain services. Tenn. Code Ann. § 71-5-108.

The Tennessee Supreme Court recently considered whether a reimbursement cap imposed by TennCare was exempt from the UAPA rules promulgation process based on the general cost-control authority granted under Section 102(d). *Emergency Med.*, 671 S.W.3d at 518–20. In that case, TennCare argued that it was not required to follow the UAPA's notice-and-comment rulemaking requirements because the first sentence of Section 102(d) gave it authority to implement cost-control measures without any mention of rulemaking requirements. *Id.* at 519. Citing the last sentence of Section 102(d), the Supreme Court reasoned that "nothing about the UAPA's rulemaking requirements is 'contrary' to section 71-5-102(d)." *Id*. The Court "reject[ed] TennCare's reading of section 71-5-102(d) as a broad exemption from the UAPA's rulemaking requirements for cost-control measures." *Id*. at 520.

Relying on that case, TennCare argues that "the State DRA *would* be 'contrary' to the cost-cutting measures in the TennCare Rules *if* the Rules were deemed to violate the statute" (emphasis in original). However, to the extent that Section 102(d) conflicts with the State DRA, the State DRA controls. Under the principles of statutory construction, "when there is a conflict between statutes which were enacted at different times, 'the more specific and more recently enacted statutory provision' generally controls." *Chartis Cas. Co. v. State*, 475 S.W.3d 240, 246 (Tenn. 2015) (quoting *Lovlace v. Copley*, 418 S.W.3d 1, 20 (Tenn. 2013)); *see also State v. Welch*, 595 S.W.3d 615, 622 (Tenn. 2020) ("Where a conflict is presented between two statutes, a more specific statutory provision takes

precedence over a more general provision.") Courts "may presume that the General Assembly is aware of its own prior enactments and knows the state of the law when it enacts a subsequent statute." *Lovlace*, 418 S.W.3d at 20 (citing *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 527 (Tenn. 2010)). The State DRA, enacted in 2007, is more recent than Section 102(d), which was enacted in 2004. The State DRA is also more specific than Section 102(d). It applies specifically to the issue at hand (the payment methodology for emergency services furnished by noncontract providers for Medicaid managed care enrollees) whereas Section 102(d) applies to cost-control initiatives generally. We conclude that Section 71-5-102(d), a general grant of authority, does not displace the clear, specific text of the more recent State DRA and that the 74% Rule and the 57% Rule are not saved by TennCare's general authority to implement initiatives or program modifications to control costs of the TennCare program.

D.

In its amended petition for declaratory order, Erlanger alleged that TennCare "erred in failing to cite" the State DRA in its submissions to the Secretary of State when it was in the process of promulgating the 74% and 57% Rules. Erlanger maintains that TennCare's omissions helped "avoid[] potential inquiry into the basis of the rates it was putting in place" and violated UAPA procedures, rendering both Rules void.

The UAPA specifically requires that "[a]ll agencies, upon filing a rule in the office of the secretary of state, shall also submit . . . [a] citation to and brief description of any federal law or regulation or any state law or regulation mandating promulgation of such rule or establishing guidelines relevant thereto[.]" Tenn. Code Ann. § 4-5-226(i)(1)(B). "The secretary of state shall refuse to accept the filing of any rule that fails to comply with" the foregoing requirement and the other requirements of subsection (i). Tenn. Code Ann. § 4-5-226(i)(4). The UAPA further provides that "[a]ny agency rule not adopted in compliance with this chapter shall be void and of no effect and shall not be effective against any person or party nor shall it be invoked by the agency for any purpose." Tenn. Code Ann. § 4-5-216.

TennCare does not dispute that it failed to cite the State DRA in the relevant filings. Our review of the administrative record confirms that the State DRA was not cited in the Rulemaking Hearing Rule Filing Forms that TennCare submitted. Rather, relying on section 4-5-226(i)(4), TennCare maintains that because the Secretary of State approved the Rules, they are valid, and to hold otherwise would amount to rigid formalism.

In its decision, the Commissioner's Designee concluded that TennCare's forms complied with section 4-5-226(i)(1)(B) because "the State DRA did not mandate

promulgation of rules." The Designee's decision overlooks the second part of the statutory requirement: "or establishing guidelines relevant thereto." Tenn. Code Ann. § 4-5-226(i)(1)(B). In addition to the two SPAs, TennCare promulgated its two Rules based on the guidelines set out in the State DRA. The 74% Rule establishes the rate of reimbursement for "outpatient emergency services, when provided to Medicaid managed care enrollees by non-contract hospitals." Tenn. Comp. R. & Regs. 1200-13-13-.08(2)(b). The 57% Rule establishes the rate of reimbursement for "inpatient hospital admissions required as the result of emergency outpatient services, when provided to Medicaid managed care enrollees by non-contract hospitals." Tenn. Comp. R. & Regs. 1200-13-13-.08(2)(c). Emergency services is the exact subject on which the State DRA prescribes what "[t]he payment amount shall be." Tenn. Code Ann. § 71-5-108; *see id*. (governing "emergency services furnished by noncontract providers for medicaid managed care enrollees"). We conclude that the State DRA demonstrably "establish[es] guidelines relevant" to the Rules.

Because the State DRA is a "state law . . . establishing guidelines relevant" to the Rules, TennCare's failure to cite it in the submissions to the Secretary of State rendered the Secretary of State's review incomplete and violated the UAPA's specific procedural requirement. Tenn. Code Ann. § 4-5-226(i)(1)(B). In its arguments on this issue, TennCare tries to minimize this statutory requirement as formalism. Elsewhere in its brief, and throughout this litigation, TennCare has asserted that the payment methodologies in the Rules comply with the State DRA, which only confirms how relevant the State DRA is to the proper formulation of the rates that TennCare promulgated through those Rules. We credit the trial court's finding that TennCare's failure to cite to the State DRA "deprived the public and other affected parties from having a fair debate about the Rules and their interplay with the applicable guidelines as set forth in the State DRA." The 74% Rule and the 57% Rule were not adopted in compliance with the UAPA's procedural requirement and are, therefore, "void and of no effect." Tenn. Code Ann. § 4-5-216; *Emergency Med*., 671 S.W.3d at 510. Accordingly, we affirm the trial court's order invalidating the Rules and reversing the Commissioner's Designee's declaratory order on this basis. *See* Tenn. Code Ann. § 4-5-322(h)(3) (agency decision subject to reversal if it was made upon unlawful procedure).

## V.    CONCLUSION

For the foregoing reasons, we affirm the trial court's August 24, 2023, order reversing the Commissioner's Designee's decision. The case is remanded for such further proceedings as may be necessary and consistent with this opinion. Costs of the appeal are taxed to the appellant, Division of TennCare, Department of Finance and Administration.

_____
JOHN W. McCLARTY, JUDGE